Commonwealth *v*. Petrillo, Appellant.

Argued September 30, 1940.   Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Daniel Greenfield,* with him *Lemuel B. Schofield,* for appellant.

*Vincent P. McDevitt,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, October 28, 1940:

Paul Petrillo, the appellant, and Rose Davis and Max Bolber were indicted as of No. 670 June Sessions, 1939, charged with the murder of Luigi La Vecchio in August, 1932. Appellant entered a plea of "not guilty." His case was called for trial before the late Judge ALBERT S. C. MILLAR and a jury on September 13, 1939.

The Commonwealth consumed about ten days in presenting its case. Eighty-nine witnesses were called and ninety-nine exhibits were offered in evidence. On page 2718 of the printed record it appears that defendant's counsel changed the plea from "not guilty" to "guilty." At that time defendant's counsel stated to the court: "There has been a great deal of testimony taken in this case and I understand that the Rules of Court now provide that two other judges must hear what other testimony is to be presented, if any, by the Commonwealth, and the defendant and his testimony. In order to expedite that, on behalf of the defendant I state that he has no objection to having the other two judges whom your Honor will call in to sit with your Honor in this

case, reading the testimony thus far taken and thereby avoiding the necessity of recalling all these witnesses." The court said to defendant: "Do you understand what Mr. Schofield has just stated?" Defendant answered: "Yes, sir." The court then said: "You are satisfied that the testimony of the witnesses may be read by the other two judges who will be called in on this case?" Defendant answered: "Yes." About a month later the court in banc, consisting of Judge MILLAR, Judge FRANK SMITH and Judge THEODORE ROSEN, heard the testimony of the defendant and one additional witness and received in evidence two exhibits offered by the appellant and the 100th exhibit offered by the Commonwealth. Shortly thereafter Judge MILLAR died. On February 23, 1940, counsel for appellant was called before Judge SMITH and Judge ROSEN and was informed that it was their intention to determine the degree of the crime and pronounce sentence upon the defendant. Counsel objected to such proceedings upon the ground that the remaining members of the court in banc were without authority under the law to determine the degree of the crime and impose sentence. Defendant's counsel also asked leave of court to file a motion on behalf of the defendant for leave to withdraw the plea of guilty entered before Judge MILLAR. Defendant's objection was overruled and his request to withdraw the plea was denied. Judge SMITH then announced that defendant had been found guilty of murder in the first degree and the penalty of death would be imposed. When defendant's counsel objected to the remaining two judges deciding this case, one of them, Judge ROSEN, said: "The three of us did hear, and did consult, and did decide both as to degree and penalty prior to Judge MILLAR's death." In the opinion filed by the court below in this case on February 23, 1940, and before the imposition of sentence, it was stated as follows: "At the conclusion of the trial, the said Judges, ALBERT S. C. MILLAR, THEODORE ROSEN and FRANK SMITH consulted, considered and discussed all the evidence of the said case. They unanimously de-

cided that the case had in it all the necessary elements of murder of the first degree in that it was wilful, deliberate and premeditated within the legal meaning of those words and so concluded. The said three Judges then consulted, considered and discussed all the evidence in determining what the penalty should be under their finding that it was murder of the first degree, and they unanimously decided that the penalty that should be imposed was that of death, and they unanimously agreed that said judgment was the official judgment of the court. In the meantime, the said Judge ALBERT S. C. MILLAR has become deceased, but up to the time he physically left the court by reason of his last illness, he never by any action or words indicated to his said colleagues that he had in any manner whatsoever changed his judgment of the degree of murder or the quantum of punishment agreed upon. The court therefore finds the defendant Paul Petrillo guilty of murder in the first degree and fixes the punishment at death." This was signed by Judges FRANK SMITH and THEODORE ROSEN.

The record in this case amply sustains the finding that defendant was guilty of murder in the first degree. The method used in killing the victim named in the indictment was that of poisoning. It was proved that during the year 1931 the defendant, with the connivance of the wife of La Vecchio, placed insurance upon his life. Some of this was placed without the insured's knowledge. The amount of the insurance was approximately $2,368. There was also proof that before the insurance was secured, Mrs. La Vecchio consulted the defendant and Morris Bolber concerning a method of getting rid of her husband and at the same time make some money in doing so. Defendant told Bolber that he would get plenty of insurance on the life of La Vecchio and would poison him and would name Mrs. La Vecchio as the beneficiary. Two weeks before the victim's death, defendant visited his home and was ushered into La Vecchio's bedroom and introduced as Professor Petrillo. Shortly after this visit, La Vecchio had vio-

lent vomiting spells. At this time defendant recommended a Dr. Vincenzo Boccelli to take care of La Vecchio. Dr. Boccelli treated him for gastro enteritis. After La Vecchio's death on August 10th, Dr. Boccelli wrote a letter to the Coroner stating that he had treated the victim for gastro enteritis, and that he had personally attended the deceased for two weeks.

Two days before the victim's death, appellant visited him and was alone with him. A half hour later, the victim had violent vomiting spells and became weaker. Defendant told the victim's wife that her husband was very sick but not to worry. The following morning defendant visited La Vecchio at 6 o'clock in the presence of Mrs. La Vecchio. He placed his arm around La Vecchio's shoulder, raised him in bed and taking two capsules from his pocket, he inserted them in decedent's mouth and gave him a glass of water, and told him to take it, that it would do him good. A half hour later, La Vecchio had a recurrence of violent vomiting spells. As defendant was leaving the house, he told Mrs. La Vecchio that if anything should happen to her husband to give him a call as he had his own undertaker. That day La Vecchio died. When defendant was informed of this, he told Mrs. La Vecchio to get her insurance policies ready as he would send the insurance agents over to help her in the collection. Proofs of death were furnished by Dr. Boccelli, who certified that the cause of death was gastro enteritis, and the insurance checks were delivered to Mrs. La Vecchio. Defendant helped her get the checks cashed. One check for $801 was deposited in the personal bank account of appellant. The widow testified that although she collected $2,000 in insurance, she received none of the proceeds, as all of it went to appellant except the check for $600 which went to the undertaker. She testified further that about a year after her husband's death, appellant and Morris Bolber entered her place of business and that through the latter she met David Davis and subsequently married him, and that appellant then suggested that she

insure Davis for a considerable amount and that he, appellant, would then murder him and make some money.

It is unnecessary to quote all the pertinent parts of the voluminous testimony in this case. Among those who testified was the co-defendant, Morris Bolber. His testimony was to the effect that Paul Petrillo and Herman Petrillo (the two Petrillos are cousins) had been operating an insurance murder ring in Philadelphia for a long time and that they had consulted him in respect to different phases of it and that he, Bolber, received money as his share of the insurance collected from various killings in which the two Petrillos were involved.

The testimony of defendant himself is amply sufficient to sustain his conviction of murder in the first degree. This testimony was heard by all three of the judges. Defendant testified that he met Morris Bolber, who told him that he needed some money and that they would make a lot of money and divide it. He said that Bolber later provided him with cards on which Petrillo's name appeared as "Professor." He said that he met Mrs. La Vecchio in February, 1932. She said to him: "Poppa [meaning Morris Bolber] sent me over." She told him to send the "insurance man Cicinato over to Bolber." She added: "He wants to talk to him." Defendant testified that a little later Bolber said to him: "I am going to get rid of her [Mrs. La Vecchio's] husband." The witness said: "He [Bolber] told me: 'You have to do me a favor. Whatever I get I give you half of it, you have to impersonate as a professor. . . . You come in with me, I am going to give you some powder, and you tell her the Professor from New York came in and he give it to him.'" This was about a month before La Vecchio died. Petrillo said that he "knew that powder would get rid of the man." Appellant told Mrs. La Vecchio to give this powder to her husband three times a day. About two and a half weeks later, i. e., on July 20, 1932, Petrillo gave Mrs. La Vecchio another package of powder to administer to her husband. Bolber informed appellant that La Vecchio had died. Bolber

said: "I finish him a long time ago and you go out for a good time and I do the work." Petrillo was asked by his own counsel: "You knew that the powder that you had given Mrs. La Vecchio would eventually kill Luigi La Vecchio, didn't you?" Appellant answered: "Why, sure." He was then asked: "What is the next thing that happened?" Defendant answered: "Two weeks after, Cicinato [the insurance agent] came in and he brought me a check for $801 and he said, 'Rosa said to give this to Morris Bolber.'" Defendant said he called Bolber and "I told him 'What I have got to do with this check for $801?' And he said, 'That is all right, you put it in bank, you draw half of it and you keep it for present.'" He added: "I deposited the check and the following day I drawed out $390 and I have about $25 in my pocket and I make up $400."

Dr. Crane, the Coroner's physician, testified that he performed an autopsy on the body of La Vecchio and that he delivered the kidneys, stomach and part of the liver to the city chemist, Dr. Burke, so that the latter could make a test. Dr. Burke testified that he made a chemical analysis of these organs and that he found a certain quantity of arsenic trioxide in the deceased's vital organs. He also found antimony in the vital organs. After a lengthy cross-examination of Dr. Crane's qualifications as an expert, he was permitted to testify as to the cause of death of La Vecchio. He stated the cause to be "arsenical poisoning in combination with antimony."

La Vecchio's widow testified that the appellant gave her husband pills followed by a glass of water. She said: "He done all the tricks." She also testified that appellant said: "If anything happens, call me up and I will call my undertaker." She testified that after her husband's death the appellant said to her: "I gave him capsules that kills him, he was no good for you. . . . When you get the money, let me know, the insurance." She also testified about one insurance policy on her husband's life being delivered to her by Cicinato

and that it was taken out by appellant without her consent, two weeks before her husband's death. She testified as to appellant receiving some of the proceeds of the insurance money. She identified a check for insurance on her husband's life received from the John Hancock Mutual Life Insurance Company for $801, endorsed by her and by Paul Petrillo, and testified that she never got any of that money. She was then asked: "There is $1,771.46 of insurance money; did you get any of it?" She answered: "Not even a penny. Q. In addition to that, how much cash did you give Petrillo? A. $200."

Since the evidence is overwhelming that defendant was guilty of murdering La Vecchio by means of poisoning and since the statute makes such an offense murder in the first degree, the evidence amply sustains the finding and judgment that defendant was guilty of murder in the first degree.

In this appeal there are two questions presented by the appellant: "1. Where, upon issue joined upon a plea of 'not guilty' in a capital case, the Commonwealth rests its case and the defendant thereupon changes his plea to 'guilty,' may the degree of the crime be determined and pronounced and sentence imposed, subsequent to the death of the trial judge, by two associate judges, neither of whom has seen or heard the Commonwealth's witnesses? 2. Where the trial judge, who alone has heard the introduction of the Commonwealth's evidence in a capital case, dies before the determination of the degree of the crime and the imposition of sentence, is it an abuse of discretion for two associate judges to refuse the defendant's motion for leave to withdraw his plea of 'guilty' entered before the trial judge, and forthwith to pronounce sentence upon the defendant?"

In *Com. v. Staush*, 256 Pa. 620, 101 A. 72, this court decided that where a defendant pleads guilty to an indictment for murder every member of a court passing upon the degree of guilt must see and hear the witnesses upon whose testimony the question is to be determined,

and where three judges heard the testimony and thereafter the president judge, who was not present during the examination of witnesses, read the evidence, joined the other judges in their deliberation, subsequently wrote the opinion of the court fixing the crime as murder of the first degree, and pronounced sentence of death, the judgment was reversed and a procedendo awarded with leave to the prisoner to renew in the court below a motion for leave to withdraw his plea of guilty.

In *Com. v. Shawell et al.*, 325 Pa. 497, 191 A. 17, Shawell, who was on trial for murder, changed his plea from not guilty to guilty. The trial judge, sitting alone in a court having three judges, heard the testimony, and found the murder to be first degree, fixing the penalty at death. The other two judges of the court concurred. Defendants were then sentenced by the entire court, all three judges sitting. Thereafter Shawell filed a motion to withdraw his plea of guilty, which was refused. This court in its opinion in that case said: "Appellants contend, however, that the decision of the court below finding them guilty of murder in the first degree was reached by three judges, two of whom neither saw nor heard the witnesses, and were thus incapacitated to pass upon their credibility. . . . The facts show that the decision was made solely by the judge who conducted the hearing, saw and heard the witnesses and passed upon their credibility. The mere fact that the other two judges were permitted to read the notes of testimony and to express their views as to the correctness of the conclusions reached by the presiding judge does not mean that they took part in the decision. The case had already been decided by the president judge when the record came into their hands, and it was perfectly proper for him to seek their sentiments in a matter of such grave consequence. . . . The president judge fully performed his duty under the Act [of May 22] 1923 [P. L. 306] before the other judges acted, and their action was merely in an advisory or supplementary capacity and not essential to the jurisdiction exercised."

Rule 43 of the criminal courts of the County of Philadelphia provides as follows: "Pleas of guilty to indictments for murder shall be heard by a court en banc, consisting of the judge before whom the plea is entered and two other judges, who shall be called in by him for that purpose. If, however, the district attorney shall certify of record that, in his opinion, the prisoner's offense rises no higher than murder of the second degree, the judge before whom the plea is entered shall alone hear the evidence and enter judgment on the plea. If a judge sitting alone to hear such plea shall, after hearing the evidence presented, or any part thereof, be of opinion that the degree of the crime should be fixed at murder of the first degree, he shall call in two other judges to hear and decide the case with him. Evidence already presented to the judge sitting alone shall be considered without being retaken, if the defendant shall expressly agree thereto."

Appellant in his brief of argument says: "There is nothing in the language of Rule 43 of the Courts of Oyer and Terminer of the County of Philadelphia, which is fundamentally inconsistent with the well-established rules of law set forth in the Staush and Shawell cases, supra. However, unless this Rule of Court is to be interpreted in a manner patently inconsistent with the law, it must be assumed that in such cases as are contemplated by the last sentence of the rule—'Evidence already presented to the judge sitting alone shall be considered without being retaken, if the defendant shall expressly agree thereto.'—the duty of the additional two judges shall be that which is set forth in the opinion of this Honorable Court in the Shawell case, supra, to wit, 'their action was merely in an advisory or supplementary capacity and not essential to the jurisdiction exercised.' "

We cannot agree with appellant's interpretation of Rule 43 that "the duty of the additional two judges . . . shall be . . . [performed] merely in an advisory or supplementary capacity." The Rule unequivocally

declares that the "judge sitting alone to hear such plea shall [in the contingency stated] call in two other judges to hear and decide the case with him." A decider is not a mere adviser. Under our decision in the Staush case, the appellant here was entitled to have all the judges who decided his guilt and his punishment present in the court room at every stage of the hearing *unless he in legal effect waived that right.* That he did waive that right in fact is conceded. Appellant's brief says: "The appellant agreed, in accordance with the provisions of Rule No. 43 . . . that the evidence already introduced before the trial judge should not be retaken before the court en banc (consisting of the trial judge and two associates) which was to consider the evidence and determine the degree of the crime."

Could the appellant *in legal effect* waive that right? There are some things in trial by jury in a capital case which a defendant cannot waive. If he goes to trial, he cannot waive his right to be tried by *twelve* jurors and consent that he be tried by a *fewer* number,[1] or that anything short of jury unanimity will support a verdict of guilty. "Trial by jury" is an institution whose form in capital cases *no individual* can change, any more than he can change the form of government. But a defendant in *any* criminal case *can* waive some of his privileges exactly as a citizen can waive some of the privileges of citizenship. These waivers by a defendant even in a capital case will not invalidate the trial, provided the essential features of trial by jury are undisturbed. As to these essential features, see *Com. v. Fugmann,* 330 Pa. 4, 29, 198 A. 99.

But though the Constitution guarantees to a defendant charged with crime a trial by jury, he may waive trial by jury and plead guilty. The Act of March 31,

---

[1] As to the rule in cases other than capital, see *Com. ex rel. Ross v. Egan,* 281 Pa. 251, 126 A. 488, and 16 R. C. L. page 222, sec. 38. Note also the Act of June 11, 1935, P. L. 319, and *Com. v. Snaman,* 131 Pa. Superior Ct. 383, 200 A. 106.

1860, P. L. 382, so providing in murder cases is not repugnant to the constitutional provision that "trial by jury shall be as heretofore and the right thereof remain inviolate." Blackstone in his Commentaries, Vol. 4, sec. 362, says: "If the jury find him [the prisoner] guilty, he is then said to be convicted of the crime whereof he stands indicted; which conviction may accrue two ways—either by his confessing the offense or pleading guilty, or by his being found so by the verdict of his court." In *Hallinger v. Davis*, 146 U. S. 314, the Supreme Court of the United States referred to numerous decisions of state courts upholding the validity of proceedings where a defendant charged with crime waives a trial by jury and elects to have his degree of guilt determined by the court. Such proceedings were held to be not repugnant to the due process clause of the 14th Amendment to the Federal Constitution. The constitutional safeguards which even the defendant himself in a capital case cannot cast aside are safeguards *implicit in trial by jury*.

In deciding the question before us two things are to be made clear: (1) The proceeding to determine the degree of the crime of murder after a plea of guilty is not a trial: *Com. v. Shawell*, supra; *People v. Chew Lan Ong*, 141 Cal. 550, 75 Pac. 186; and *State v. Almy* (N. H.), 28 Atl. 372. (2) Even in trials by jury there are certain constitutional rights which an accused can waive; among these are "the right to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, . . . a speedy public trial by an impartial jury. . . ." To secure the latter right (i. e., trial by an impartial jury), a defendant must exercise the challenges allowed him by law. If a defendant is convicted and applies for and receives a new trial, he waives his right *not* to be put for the same offense "twice in jeopardy of life or limb." These and other rights a defendant *can* waive without disturbing a single essential feature of the right of "trial by jury." A defendant's right to "meet witnesses face to face" is

waived whenever he consents to the taking and reading of depositions against him at his trial. Wigmore on Evidence, 3d ed., Vol. 5, sec. 1398, says: "In dealing with depositions and former testimony of deceased or absent witnesses, our courts have almost unanimously received them, when offered against the accused in criminal prosecutions, as not being obnoxious to the constitutional provisions, if the right of cross-examination had been satisfied." Even in cases where the defendant does not consent to the jury's hearing testimony given against him in earlier proceedings the courts have permitted such testimony to be admitted. In *Com. v. Ryhal*, 274 Pa. 401, 118 A. 358, this court, in an opinion by the present Chief Justice, held that there was no error in admitting at the trial of defendant on an indictment charging murder the testimony of a witness, deceased at the time of trial, which had been given against the accused at a preliminary hearing, where the accused had an opportunity to subject the witness to cross-examination. In that case the charges the defendant was called on to meet at the preliminary hearing, were not the same on which he was tried, but this court said: "They grew out of the same facts and circumstances— the assault upon the girl by him—the only circumstances not existing on the preliminary hearing when the testimony was given and which had supervened at the trial was the culminating one, her death." There jurors serving in a capital case considered the evidence of a cross-examined witness *unseen* and *unheard by them,* and we upheld the procedure. Likewise, in the instant case we find that Judge SMITH and Judge ROSEN in considering the testimony of cross-examined witnesses unseen and unheard by them, the defendant having expressly agreed to this procedure, gave the appellant no ground for valid complaint. What in the Staush case (supra) we declared to be a defendant's right, we did *not* say was a right which *could not be waived.* In *State v. Vanella*, 106 Pac. 364, the Supreme Court of Montana, in an opinion in a murder case, said: "The rights guaranteed to

one accused of crime fall naturally into two classes: (a) Those in which the state, as well as the accused, is interested; and (b) those which are personal to the accused, which are in the nature of personal privileges. Those of the first class cannot be waived; those of the second may be." Rights so fundamental in their nature as to be regarded by the state as vitally integrated in our immemorially established processes of administering justice cannot be waived by anyone; rights not so integrated and relating only to methods of proof and procedure can be waived by the person proceeded against.

Appellant's proposition that triers of facts are "completely incapacitated from judging the credibility of" witnesses they did not see or hear, is untenable. If it were sound, dying declarations and many other forms of hearsay testimony as well as depositions and testimony given on former trials would all have to be excluded in the trial of capital and other criminal cases.

In *People v. Murray,* 17 N. W. 843, it was held by the Supreme Court of Michigan that a defendant convicted of murder could not complain of the receipt of depositions in evidence after having agreed to it. See also *State v. Fooks,* 65 Iowa 452, 21 N. W. 773, and *State v. Polson,* 29 Iowa 133. In *Williams v. State,* 61 Wis. 281, 21 N. W. 56, it was held that there was no error in receiving at the trial, with the consent of the accused, the evidence a physician gave at the inquest. To the same effect was the decision in *State v. Wagner,* 78 Mo. 644, where a defendant indicted for murder, consented, in order to expedite the trial, that certain statements of an absent witness might be read in evidence. In *State v. Mortensen,* 26 Utah 312, 73 Pac. 562, counsel for the state and for the defendant respectively, stipulated in open court that if an absent witness were present he would testify to certain recited facts. Upon appeal after conviction, it was held that this did not invalidate the verdict.

In the instant case the evidence, and particularly the defendant's own evidence heard by all three judges,

proved beyond a reasonable doubt that the defendant was guilty of murdering his victim "by means of poison," and this the law declares to be "murder in the first degree." See *Com. v. Danz*, 211 Pa. 507, 60 A. 1070. While the judges who decided this case after the defendant pleaded guilty of murder had the *power* to find him guilty of murder in the second degree *(Com. v. Curcio*, 216 Pa. 380, 65 A. 792), such a verdict would under the evidence have been in the teeth of the law. The defendant being clearly guilty of murder in the first degree, the only other question before the tribunal was that of the appropriate penalty. In determining what the penalty shall be after convictions in criminal cases, courts have a wide latitude in considering facts, whether or not these facts are produced by witnesses whom the members of the court see and hear. In many jurisdictions courts in determining proper sentences consider official records and the reports of probation officers, psychiatrists and others. This court without *seeing* or *hearing any* witnesses can determine whether a sentence of death for murder in the first degree should be reduced to life imprisonment: *Com. v. Garramone*, 307 Pa. 507, 161 A. 733. It would be carrying technicalities to absurd length[2] to hold that on the only substantial issue before the tribunal below, which was: "What is the appropriate penalty to impose on this self-convicted murderer whom we adjudge to be a first degree murderer?" the tribunal could consider *only* the testimony of witnesses whom they had *all seen and heard,* even though the defendant and his counsel had agreed that Judges SMITH and ROSEN, who with Judge MILLAR constituted the court, could read "the testimony thus far taken," (and by clear implication base their

---

[2] William H. Taft said on June 26, 1905: "When a court of highest authority interposes a bare technicality between a defendant and his just conviction, it is not too much to charge some of the laxity in our administration of the criminal law to a proneness on the part of courts of last resort to find error and to reverse judgments of conviction." Taft: "Present Day Problems," p. 353.

decision on it together with the other testimony to be received in evidence), "and thereby avoid the necessity of recalling all these witnesses."

The death of Judge MILLAR before sentence was imposed did not affect the right of the court, of which he had been a member, to impose it. This proposition is so self-evident as to make the citation of authority in support of it almost superfluous. 7 R. C. L. p. 999, sec. 28: "It may be stated as the general rule that the death, disqualification or absence of a judge will not deprive the surviving or remaining judges of authority to hold court and transact the business of the court, and in fact to exercise all functions pertaining to the particular court, provided, however, that the number of the court is not reduced below that legally required for the transaction of its business." In *Pegalow v. The State,* 20 Wis. 61, the Supreme Court of Wisconsin said: "The circuit judge before whom the plaintiff in error was tried and convicted [of murder in the first degree], has gone out of office, and has been succeeded by the present judge, who has pronounced judgment upon the verdict in conformity to the directions of this court. . . . The question . . . is whether the circuit judge had power to pass sentence upon a prisoner convicted before his predecessor in office. We think the circuit judge had this power [citing authorities]."

The decision of the court below in this case both as to the guilt of the appellant and as to the penalty was the decision of *all three* of the judges constituting the court at that time. The statement formally made to that effect by Judges SMITH and ROSEN after the death of Judge MILLAR must be accepted as verity. The imposition of the sentence inevitably followed and it was in all respects legal. The refusal of defendant's motion for leave to withdraw his plea of guilty was not an abuse of discretion.

The judgment is affirmed and the record is remitted to the court below so that sentence may be executed.