Commonwealth *v.* Johnson, Appellant.

Argued November 22, 1943. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Samuel Kagle*, with him *Mercer L. Lewis*, for appellant.

*Charles C. Gordon*, Assistant District Attorney, with him *John H. Maurer*, District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 3, 1944:

The defendant, Harry Johnson, killed Clifton Conley on the 17th day of September, 1942, while both were convicts in Holmesburg Prison.

Johnson was later tried for first degree murder before Judge GEORGE GOWAN PARRY and a jury, and was found guilty. He was granted a new trial "not because of an insufficiency of evidence or action of the jury but because of errors in the Court's charge". On May 19, 1943,

the defendant with his counsel withdrew his plea of "not Guilty and pleaded Guilty" to murder before Judge JOSEPH SLOANE. On the same day before Judges ALESSANDRONI and KUN, evidence was offered and testimony taken to establish the degree of guilt. Counsel for the defendant and the Commonwealth made arguments to the court after which Judge SLOANE said, "I will recommit him and we will bring him back and announce the degree and the sentence."

The next step in the proceedings as appears by the record was taken on July 6, 1943, when Judge SLOANE in open court said to the defendant: "Now Defendant has pleaded guilty to the indictment generally, and the matter is before us, a court en banc (Judges ALESSANDRONI, KUN and SLOANE) to determine the degree of the crime and the sentence. . . . The facts disclosed a clear case of wilful, deliberate and premeditated killing, as an act of revenge. . . . Accordingly we adjudge the defendant guilty of murder in the first degree." Judge SLOANE then imposed the sentence of death.

The record also discloses that before this formal adjudication the court received a large amount of information about the defendant's criminal record. Some of this was of a documentary character and some of it was oral. In the remarks made by Judge SLOANE before he imposed sentence he said, inter alia, "We talked with Warden Smith, of the Penitentiary, Dr. Baldi, of the County Prison, and the parole officer of the Penitentiary. No one has a good word for him—he is troublesome and dangerous. We got and examined the penitentiary report of his misconduct in prison; it is not a good one. In 1934, this defendant hit another inmate with a smoking stand, and cut that inmate's forehead; the guard found the latter inmate to blame." Several other statements of a similar tenor were made at the same time by Judge SLOANE. The record is silent as to whether or not this information which the court received as to the defendant's record entered into the court's deliberations

in fixing *the degree* of murder of which the defendant was guilty. A statement by Judge ALESSANDRONI indicates affirmatively that in fixing *the degree* of the crime of which the defendant was guilty the court considered the defendant's record. Judge ALESSANDRONI said just after sentence was imposed: "As I understand the opinion of this tribunal it is that,—in the degree of the sentence and in the imposition of sentence it is not only the right but the duty of the court to inquire into matters that are not necessarily part of the trial itself." The phrase, "in the degree of the sentence" apparently means "in fixing the degree of the murder", though possibly Judge ALESSANDRONI did not so intend it.

It is a prisoner's constitutional right in this Commonwealth "to meet the witnesses face to face" (Sec. 9, Bill of Rights). In *Com. v. Corsino,* 261 Pa. 593, at 598, we held: "It is the inherent right of the prisoner in a capital case to be present at every stage of the proceedings from the arraignment to the rendition of the verdict. Neither court nor judge can take any step affecting his right in his absence." In *Prine v. Com.,* 18 Pa. 103, Chief Justice GIBSON said: "It is undoubtedly error to try a person for felony in his absence, even with his consent. It would be contrary to the dictates of humanity to let him waive the advantage which a view of his sad plight might give him by inclining the hearts of the jurors to listen to his defense with indulgence. Never has there heretofore been a prisoner tried for felony in his absence." In *Com. v. House,* 6 Pa. Superior Ct. 92, at 113, Judge RICE said: "It is better that this case should be tried a third time than that such a precedent [as having the defendant absent during any part of his trial] should be established."

The principle has long been established in our criminal jurisprudence that in capital cases the record must show that the prisoner was present at the trial, verdict and at the passing of the sentence: *Dunn v. Com.,* 6 Pa. 384. What was said by this court in that case is appli-

cable here. "This [case] presents a state of confusion and uncertainty in the record which cannot be relieved by any justifiable presumption, in a case involving the life of a fellow being." This principle was reiterated in *Com. v. Silcox*, 161 Pa. 484, 496, 29 A. 105, where we said: "In capital cases the record must show affirmatively that the prisoner was present at every stage of the proceedings against him." *Dunn v. Com.* was cited with approval in *Com. v. Robinson et al.*, 317 Pa. 321, 330, 176 A. 908. As was said in *Reagan et ux. v. Reading Co.*, 126 Pa. Superior Ct. 175, 184, 190 A. 412: "We can look only to the record in this case . . . and we cannot permit conjecture to supply what the evidence does not contain."

This record does *not* show that the prisoner was adjudged guilty of murder in the first degree *before* any evidence of his criminal record was received in his absence. The conclusion is inescapable that *when* the court fixed the degree of the defendant's guilt of murder his criminal record received in his absence *was* before it. The granting of a new trial is therefore imperative. As Justice MILLER said in *Ex parte Lange,* 85 U. S. 163: "There is no more sacred duty of a court than . . . to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman."

We are reversing this judgment not because ex parte testimony was received by the court before it determined the sentence; we are reversing the judgment *because the record does not show affirmatively that no ex parte evidence was received by the court before it determined and declared the degree of the defendant's guilt of murder.*

In *Com. v. Petrillo,* 340 Pa. 33, 47, 16 A. 2d 50, this court said: "In determining what the penalty shall be after convictions in criminal cases, courts have a wide latitude in considering facts, whether or not these facts are produced by witnesses whom the members of the court see and hear. In many jurisdictions courts in determining proper sentences consider official records and

the reports of probation officers, psychiatrists and others. This court without *seeing* or *hearing any* witnesses can determine whether a sentence of death for murder in the first degree should be reduced to life imprisonment: *Com. v. Garramone,* 307 Pa. 507, 161 A. 733."

Any other rule than the one thus enunciated would be an impracticable one for courts to apply in exercising their discretionary power, within statutory limits, to impose appropriate sentences on convicted defendants, in the vast majority of criminal cases. A judge whose duty it is to determine the proper sentence imposed on those convicted of crime cannot be expected to limit himself to only that which appears in the record of the trial of the prisoner. It is to the benefit of society and it *may be* of benefit to the prisoner, to have the sentencing judge consider facts other than those adduced at the trial. Such facts might militate in a prisoner's favor or they might militate against him.

However, when a judge is faced with the duty of determining whether or not a convicted murderer is to be sentenced to death or life imprisonment the seriousness of the problem is such that a judge who is possessed of that zeal to do justice which characterizes the just judge, will as far as is practicable, give the defendant an opportunity to confront the witnesses against him and to offer evidence in his own behalf. Such a procedure if followed will be informative to the understanding and enlightening to the judgment, of the sentencing tribunal.

That the procedure just outlined is the proper one to be followed by courts of oyer and terminer in fixing the penalty in first degree murder cases and might reasonably be held to be the required one, is made manifest by a consideration of the Act of May 14, 1925, P. L. 759, 18 P.S. Sec. 2222; (Criminal Code of June 24, 1939, P. L. 872, Sec. 701, 1942 Annual Pocket part of 18 P.S. Sec. 4701), which gives the jury trying a murder case

and which finds the defendant guilty of murder of the first degree "the discretion" to "fix the penalty by its verdict", and which in case of pleas of guilty of murder gives the court "the discretion" to "impose sentence of death or imprisonment for life". We said in *Com. v. Williams,* 307 Pa. 134, 150, 160 A. 602, "That act introduced a new feature in the procedure of homicide trials." We said in *Com. v. Parker,* 294 Pa. 144, 154, 143 A. 904: "The act requires both the question of guilt and the punishment to be covered by one verdict. . . . There is no provision for a separate inquiry . . . nor is there any evidence that the statute intended there should be such a separate inquiry."

It follows that when a *jury* adjudges a defendant guilty of murder of the first degree and fixes the penalty, *all* of the evidence must be heard in the presence of the defendant. It would obviously be error for a jury to separate after finding a defendant guilty of murder in the first degree and then to reassemble and hear ex parte evidence as to the defendant's record, before fixing the penalty. It may not so obviously be error for the judges of a court en banc to separate after finding a defendant guilty of murder in the first degree and then to reassemble to hear ex parte evidence on which to base their judgment as the appropriate penalty to be imposed, but the manifestly correct practice is for the judges of the court en banc sitting in cases of murder to hear all the testimony in the case, *including the testimony which relates to the fixing of the penalty, in the presence of the defendant and his counsel* and to give him an opportunity to meet any adverse testimony against him and to present evidence in his own behalf, before determining *either* the defendant's degree of guilt of murder *or* the penalty to be imposed upon him.

The judgment is reversed and a new trial is ordered.