## Commonwealth ex rel. Hendrickson, Appellant, v. Myers.

Argued November 11, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*William J. Woolston,* for appellant.

*Donald W. VanArtsdalen,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, March 24, 1958:

The appellant-petitioner, Robert E. Hendrickson, was arrested on August 10, 1946, upon four separate

charges of burglary, larceny and receiving stolen goods. While awaiting trial on these charges he escaped from the Bucks County prison and was recaptured on the day of escape. Subsequently, the appellant entered a guilty plea on the five bills of indictment which charged him with burglary, larceny, receiving stolen goods and prison breach. Prior to sentence appellant admitted the larceny of still another automobile in Washington, D. C. in August 1945, although the charge against him in that instance was "dropped", presumably because of his service in the Navy. The late Judge BOYER sentenced the appellant on one of the burglary charges to a term of imprisonment of not less than 3 nor more than 10 years. Judge BOYER also sentenced appellant to a further and consecutive term of not less than 1 nor more than 2 years on the indictment charging prison breach. Sentence on the other bills of indictment was suspended. At the time of the trial, appellant was 22 years of age.

Within the period of approximately 10 years, the appellant was twice paroled by the Pennsylvania Board of Parole. Each time appellant violated his parole and was returned to prison. The first violation was a technical one; the second involved a violation of the Uniform Firearms Act. The appellant's unexpired prison term will terminate in December 1959.

In April of 1956, appellant filed his petition for a writ of habeas corpus; this was denied by both the lower court and a unanimous Superior Court. An allocatur was allowed by this Court. The petition originally raised several issues, but on this appeal appellant presses only one, namely, the sentence imposed in 1946 was illegal and void because the sentencing Judge was informed of and considered the appellant's Juvenile Court record in imposing sentence. Appellant had been found delinquent when he was approxi-

mately 17 years of age as the result of a burglary then committed by him. Appellant contends that the use of said Juvenile Court record in the consideration of the aforesaid sentences was in violation of §19 of the Act of June 2, 1933, P. L. 1433, 11 PS §261. Section 19 of that Act provides as follows: "No order made by any Juvenile Court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal laws of the Commonwealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime. The disposition of a child or any evidence given in a Juvenile Court shall not be admissible *as evidence**
against the child in any case or proceeding in any other Court."

Generally speaking, there are several cogent reasons why juvenile records and evidence given in juvenile proceedings should not be used as evidence against a child in any case or proceeding in any other court. Juvenile Court proceedings are normally informal, and many of the important constitutional and statutory guarantees afforded a defendant in a criminal trial do not apply to a juvenile in a hearing before a Juvenile Court: *Holmes' Appeal*, 379 Pa. 599, 109 A. 2d 523. For these reasons, it would be unjust and illegal to allow the introduction of juvenile records or evidence given in juvenile cases to be later introduced as competent evidence in criminal cases or proceedings in any other court, in the same manner as criminal convictions or evidence taken in criminal proceedings may in certain instances be competent evidence in other criminal proceedings.

The statutory prohibition, however, was not transgressed by the lower Court. Section 19 does not pro-

---

* Italics throughout, ours.

hibit the use of the "disposition of a child or any evidence given in a juvenile court" for *any* purpose; on the contrary, it bans the use of said order or evidence only when used "as *evidence* against the child in any case or proceeding in any other Court". Although the Legislature failed to define the word "evidence" in the statute, it is obvious that the Legislature used and intended to use "evidence" in its generally accepted meaning—testimony and matters actually presented at the trial.

Bouvier's Law Dictionary, Third Revision, accurately states: "Testimony is not synonymous with evidence; Harvey v. Smith, 17 Ind. 272; the latter is the more comprehensive term; Whart. Cr. L. §783; and includes all that may be submitted to the jury whether it be the statement of witnesses, or the contents of papers, documents, or records, or the inspection of whatever the jury may be permitted to examine and consider during the trial; Will, Cir. Ev. 2; Jones v. Gregory, 48 Ill. App. 230."

Black's Law Dictionary, Fourth Edition, defines "evidence" as *"Any species of proof, or probative matter, legally presented at the trial of an issue,* by the act of the parties and through the medium of witnesses, records, documents, concrete objects, etc., for the purpose of inducing belief in the minds of the court or jury as to their contention."

The Juvenile Court record was not introduced or presented as evidence in the trial. Moreover, the Juvenile Court record was not considered, even after the trial, to determine a factual issue, i.e., his guilt or innocence of the crimes with which he was charged; on the contrary, the juvenile record was taken into consideration by the trial Judge *after the appellant had pleaded guilty* and then only for the purpose of imposing a fair, proper and just sentence.

In *Holmes' Appeal*, 379 Pa., supra, former Chief Justice STERN, speaking for the Court, said (pages 607-608): ". . . In Williams v. New York, 337 U. S. 241, the court pointed out that, as distinguished from the situation where the question for consideration is the guilt of a defendant, it has always been the right of a court in sentencing to consider information concerning the defendant's past life, health, habits, conduct, and mental and moral propensities, even though such information is obtained outside the courtroom from persons whom the defendant has not been permitted to confront or cross-examine. The court said: (p. 247) 'Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.' And further (p. 249): 'Under the practice of individualizing punishments, investigational techniques have been given an important role. Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders. Their reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information.' "

As Judge HIRT said in his able opinion (182 Pa. Superior Ct. 169, 173): "The judge was entitled to all of the material facts to inform him as to what kind of an offender he was dealing with in determining the appropriate penalty. Commonwealth v. Petrillo, 340 Pa. 33, 47, 16 A. 2d 50."

In *Commonwealth v. Petrillo,* the Court said—with respect to cases other than first degree murder—". . . In determining what the penalty shall be after convictions .in criminal cases, courts have a wide latitude in considering facts, whether or not these facts are produced by witnesses whom the members of the court see and hear. . In many jurisdictions courts in determining proper sentences consider official records and the reports of probation officers, psychiatrists and others."

*Commonwealth v. Johnson,* 348 Pa. 349, 35 A. 2d 312, reaffirmed the above quoted principle of law enunciated in the *Petrillo* case, and added the following (page 354) : "Any other rule·than the one thus enunciated would be an impracticable one for courts to apply in exercising their discretionary power, within statutory limits, to impose appropriate sentences on convicted defendants, in the vast majority of criminal cases. A judge whose duty it is to determine the proper sentence imposed on those convicted of crime cannot be expected to limit himself to only that which appears in the record of the trial of the prisoner. It is to the benefit of society and it may be of benefit to the prisoner, to have the sentencing judge consider facts other than those adduced at the trial. Such facts might militate in a prisoner's favor, or they might militate against him."*

In *Commonwealth ex rel. Czarnecki v. Stitzel,* 179 Pa. Superior Ct. 80, 115 A.· 2d 805, the Court said (pages 82-83) : "A judge faces a grave responsibility in sentencing boys in their middle and late teens. On

---

* See also *Commonwealth ex rel. Miller v. Maroney,* 179 Pa. Superior Ct. 305, 116 A. 2d 755, where a Juvenile Court record was used by the sentencing Judge, and *Commonwealth ex rel. Yeschenko v. Keenan,* 179 Pa. Superior Ct. 145, 115 A. 2d 386.

the one hand every effort should be made to give them an opportunity to reform. On the other hand the court has a responsibility to the law abiding citizens to protect them from young desperadoes who frequently are involved in the most violent and vicious of crimes. A sentencing judge, and others dealing with the sentence, cannot with justice to the boy or the public ignore completely the boy's conduct during the time he was within the age of the juvenile court law."

To deprive the courts of the right to be informed of and to consider the history and background of the person subject to sentence may result in sentences which are unjust and unfair to both society and defendants.

The judgment of the Superior Court is affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Four courts have passed upon this case and each one in its turn has treated an Act of the Legislature as if it were written on water instead of on stiff durable pages of a statute book representing the will of the people of Pennsylvania.

Prior to 1933 there was no separate court in Pennsylvania with exclusive jurisdiction over children charged with violating law. Minors accused of crime were prosecuted in the quarter sessions courts equally with adults. A movement was launched to take youthful defendants out of the criminal courts. It was said that persons of tender years should not be tried with all the formalities and rigidities of a court procedure geared for older people. It was said that children who got into trouble innocently or otherwise should be brought for judgment before a judge who would not be bound by rules of evidence. It was said that a relaxation of these rules would enable the judge to obtain a better picture of the child's background, environ-

ment, weaknesses, temptations, and so on, and in that way the judge could better decide what would be best for the child's welfare. It was said further that in these proceedings the minor would not need to have a lawyer and, it would not be necessary to bring accusing witnesses into court so that the minor could face his accusers. It was said also that the judge could listen to hearsay.

There were many, of course, who opposed this wholesale breakage of constitutional guarantees which were synonymous with a fair trial as we understand fair trials in America. These persons pointed out that if hearsay testimony would be permitted, and confrontation abolished, a child could be convicted on mere rumors and his liberty taken from him on unsubstantiated gossip. The proponents of the change replied that the object of a juvenile court proceeding would not be to find a child guilty or not guilty, as those terms are understood in criminal proceedings. The opponents of the change countered with: "Yes, but if you allow this type of unreliable evidence to be used and the court concludes that the child is delinquent, the Juvenile Court record may be introduced against him in the criminal courts if he should be charged with crime after he reaches adulthood." The proponents laughed at this spoken fear. "Perish the thought!" they replied. "Since a juvenile court proceeding is not a trial, it follows naturally that any adverse finding against the child is not to be regarded as a conviction, and certainly it could never be used against him later on in any way, shape, manner, form, size, guise or contour."

The opponents, being thoroughly aware of the sad fact that once a constitutional breach is effected the repair is difficult, demanded to be assured with statutory solemnity that if unconstitutional methods were to be employed in adjudicating a child in the juvenile

court, the resulting juvenile court record was never to be brandished against him at any time in the future, no matter where, how, or in what circumstances. The proponents smiled patronizingly: "Why, of course, we will go along with that. We are interested only in getting the child back on the straight and narrow path, and if, in future days, he should stray from that path or defile, guilelessly or intentionally, his juvenile peccadillos or escapades will never be brought forward to haunt him, torment him, or embarrass him in any way. If anything is certain, it is this."

And so, from this debate which was heard in all sections of the Commonwealth, and particularly in the legislative halls in Harrisburg, was born that provision in the Juvenile Court Act which three other courts and this Court have treated as if it were inscribed on the surface of a lazy summer, stagnant pond instead of on living parchment in the statute books and in the hearts and minds of all children-loving people in this great Commonwealth of ours.

The provision to which I refer reads as follows: "No order made by any juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal laws of the Commonwealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime. The disposition of a child or any evidence given in a juvenile court shall not be admissible as evidence against the child in any case or proceeding in any other court."

Let us see how this specific mandate of the people has been respected in this case before us for review. On April 30, 1942, Robert Hendrickson was brought before the Juvenile Court of Bucks County in connection with an alleged burglary. The court entered the following order: "The Court orders and directs that

Robert Hendrickson be returned into the custody of his step-father, and undergo probation until he arrives at the age of eighteen years, under the supervision of L. Gertrude Bright, Bucks County Probation Officer."

According to the Act of 1933, this entry was never to be admitted against Robert Hendrickson "in any case or proceeding in any other court." Whatever he had done prior to April 30, 1942, so far as other courts was concerned, was to be buried in the sands of oblivion. This Court in the case of *Holmes' Appeal*, 379 Pa. 599, said: "The proceedings in such a court [juvenile] are not in the nature of a criminal trial but constitute merely a civil inquiry or action looking to the treatment, reformation and rehabilitation of the minor child."

It emphasized: "No suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court."

Thus, with the solemn guarantee of a statute and the equally earnest assurances of the Supreme Court, Robert Hendrickson had reason to believe that his juvenile mistakes had fallen into the sea of forgetfulness never to be dredged up to haunt him in the event he should, as an adult, run afoul of the law. He was to have a sad awakening.

Four years after his appearance in juvenile court, that is, on September 4, 1946, he was brought before Judge BOYER of the Court of Quarter Sessions of Bucks County to answer to various criminal charges—and the very first thing the Quarter Sessions Judge turned to was Robert's juvenile court record! The assurances made prior to 1933 about the non-judicial use of juvenile court records were treated as if they had never been spoken. What the statute of 1933 peremptorily ordered was ignored; what the appellate courts of this

Commonwealth directed was discarded. The presiding judge in the court of quarter sessions thrust his arm deep into the juvenile court records. This was not enough. He reached into the archives of his memory to personally recall what had happened to Robert in the juvenile court. While doing this, he kindled his emotions, he stoked the fires of his indignation, he called upon the furies of vengeance—and from the heights of his Olympian wrath he hurled these thunderbolts: "This Court tried to help you many years ago by placing you on probation when you were charged with burglary as a boy. You committed a serious crime there . . . This Court was so anxious to help you and to make a man of you that instead of sending you away, as we might have done, we placed you on probation in charge of Miss Bright, the Probation Officer. We did not hear any more about you after that until this occurrence here. That should have taught you several things. It should have taught you in the first place, that it is foolish, it is stupid, it is just plain dumb, to commit crimes. There is nothing gained by it. You are no richer than you were because of these crimes. You haven't won any respect from anybody. Everybody that knows you will now despise you. They will look down upon you. Everybody of any intelligence, everybody of any standing or decency now looks down upon you as just a stupid, common criminal. Now can you think of anything that could be said in your own favor? I can't think of anything."

Was this an adjudication of law or was it the eruption of a volcano? The judicial Jupiter fulminated: "Everybody that knows you will now despise you." Was that part of the sentence? He ended his fiery outburst with: "Can you think of anything that could be said in your favor? I can't think of anything." It is easy to understand why he could not think of any-

thing. When anger sweeps the brain, the lantern of reasoning is extinguished.

When the court finally got around to imposing punishment, Robert Hendrickson received a sentence of from 4 to 12 years in the Eastern State Penitentiary. He was paroled on February 12, 1951. Later he got into some further difficulties with the law and was recommitted to the penitentiary. On April 13, 1956, he filed a petition for a writ of habeas corpus, challenging the proceedings of 1946 on two grounds: (1) that he was denied counsel at this hearing, and (2) that it was illegal to introduce against him the juvenile court records of 1942.

The Court of Quarter Sessions of Bucks County dismissed the writ with the blithesome utterance that the petitioner was not entitled to a lawyer. But the Constitution of Pennsylvania says something on this score: "In all criminal prosecutions, the accused hath a right to be heard by himself *and his counsel,* to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land."

The court said further that even if Robert had had a lawyer at the hearing in 1946, this would not have helped him. It is interesting to observe how the Judge responded to Robert's insistence that he should have had the legal counsel guaranteed to him by the Constitution: "By the Court: . . . Q. All right, would you care to spell out just in what way you were denied anything by that? How were you prejudiced by that?

A. By not being informed of the right to counsel. By not being asked if I wanted counsel. Q. All right, answer my question. How were you prejudiced by that? What difference would it have made if you had had counsel? Where was any advantage taken of you because you didn't have counsel? A. Well, I think if I had counsel a lot of things that were brought up at the trial would have been clarified. *For instance, the misrepresentation of my juvenile record* and due to the fact that a juvenile record isn't convictions, there was no decision handed down on them, it is not considered an adult criminal record. Q. Anything else? You have your opportunity. I am not trying to cut you off. I want you to say fully what your position is so that we understand it. A. *Yes, I don't think I would have gotten as severe a sentence if I would have had legal help.* I have now served nine years and nine months of a sentence imposed in this Court. That is all."*

It can happen and it does happen that a doctor called to treat a severely injured or ill person may not be able to save the patient's life, but it can happen and does happen that a doctor will draw the sufferer up out of the well of doom and restore a life which might otherwise have been forfeited. If a lawyer had been present at the hearing in 1946 he would have called to the Judge's attention the impropriety and illegality of using Hendrickson's juvenile court record in a quarter sessions proceeding. For illegality it was, if statutes are not to be treated simply as printing trivia.

The lower Court said: "It is incomprehensible that the Legislature intended a judge sitting in the Court of Quarter Sessions to ignore and entirely put out of his mind that which he knows or at one time did know

---

* Italics throughout, mine.

as a judge of the Juvenile Court, particularly when it is all important both to the public as well as to the ac-cused to ascertain all possible background information in order to impose an intelligent sentence upon a convicted felon."

Hendrickson appealed to the Superior Court, assigning the action of the Court of Quarter Sessions of Bucks County as error. The Superior Court affirmed the sentence and declared that the lower court was entitled to consider the juvenile court record of the defendant in sentencing him, namely, "The judge was entitled to all of the material facts to inform him as to what kind of an offender he was dealing with to assist him in determining the appropriate penalty."

The defendant has now appealed to this Court, and the Majority of this Court also says that the lower court was without error in using Hendrickson's juvenile court record as the platform upon which to build the eventual disposition of the case. But the repetition of this affirmance lends no legality to the procedure. What is wrong is wrong, even if repeated a hundred times. The statute prohibits the use of a juvenile court record in the criminal courts of the Commonwealth, and, in the parade of citizens who obey, respect, and salute the law of the land, the judges should head the procession.

In attempted support of its statute-violating proposition that a juvenile court record is properly before a criminal court judge, the lower court cited the case of *Commonwealth v. Petrillo*, 340 Pa. 33. The *Petrillo* case is as remote from the situation under discussion as Cuba is from China. The *Petrillo* case had nothing to do with minors, it made no reference to juvenile court records, it did not involve a defiance of statute.

In that case, the defendant Paul Petrillo, a grown man, after the Commonwealth had presented its evi-

dence on a murder charge in the Court of Oyer and Terminer of Philadelphia County, changed his plea from not guilty to guilty, and agreed to have the rest of his case heard by the trial judge and two associate judges. These three judges heard all the evidence presented in behalf of the defendant and found him guilty of first degree murder, which verdict carried with it the death penalty. Before sentence could be imposed the trial judge died. Petrillo now attempted to withdraw his plea of guilty, asserting that the associate judges were "incapacitated" from sitting in judgment on his case since they had not heard the Commonwealth's evidence. This Court affirmed the sentence and said: "The defendant, being clearly guilty of murder in the first degree, the only other question before the tribunal was that of the appropriate penalty. In determining what the penalty shall be after convictions in criminal cases, courts have a wide latitude in considering facts, whether or not these facts are produced by witnesses whom the members of the court see and hear. In many jurisdictions courts in determining proper sentences consider official records and the reports of probation officers, psychiatrists and others. This court without *seeing* or *hearing any* witnesses can determine whether a sentence of death for murder in the first degree should be reduced to life imprisonment." (Emphasis in original).

The Majority Opinion in the case at bar only quotes part of the above quotation and thus conveys an idea wholly different from what the case holds. It is about time, in the interests of consistency, relevancy, and correctness, that courts cease citing the *Petrillo* case as authority for nullifying the plain mandate of the Juvenile Court Act of 1933. It is about time to retire this case from the extracurricular chore to which it has been subjected over the years.

And it certainly is time for this Court to take a definitive stand on what is to be done with Section 19 of the Juvenile Court law. Either it is to be accepted as it is written or it is to be jettisoned. If it is to be accepted, it must be read in the pure and pristine strength of its lucid phraseology and not dipped in the acids of interpretation which distort it beyond recognition. The statute says, let me repeat: "The disposition of a child or any evidence given in a juvenile court shall not be admissible as evidence against the child in any case or proceeding in any other court."

The proceedings of September 4, 1946, occurred in the court of quarter sessions, obviously a different court from the juvenile court. The District Attorney of Bucks County says in his brief that since the Court of Quarter Sessions in Bucks County "sits as a Juvenile Court," it is "strictly speaking," "the same Court that imposed sentence upon Relator in 1946 as held the juvenile hearing in 1942 when Relator was placed on probation for an occurrence which, had he been over the juvenile age, would have constituted burglary." This, I am constrained to say, amounts to quibbling in the lowermost cellar of subterfuge.

The fact that the robed figure sitting on two different courts happens to be the same individual does not make the courts interchangeable. If what counsel says were true there would be no distinction between common pleas courts and equity courts; common pleas courts and quarter sessions courts would blend into one tribunal; and orphans' courts, in the non-metropolitan counties, would cease to exist. We know that in Pennsylvania the common pleas judges periodically sit in the criminal courts. It would be ridiculous in the extreme, to say nothing of its being monumentally unjust, to declare that when a judge sits in a common pleas trial he should hold against the plaintiff or de-

fendant what he may have learned about him in criminal court. Nor would the reverse situation be permissible or just, or even fundamentally honest.

.The Majority Opinion of this Court says that Robert Hendrickson's juvenile court record was not really used against him because it was only considered after he had pleaded guilty. But what difference does it make whether a person is struck with a club in the afternoon or in the evening, if he is not entitled to be clubbed at all? The Majority says that the record was considered only for the purpose of "imposing a fair, proper, and just sentence." But if a record is to be used for the purpose of imposing a sentence, it should be a *reliable* record, it should be a just record. Suppose that at the termination of a criminal trial which found the defendant guilty, some unknown person appeared in court and said to the judge: "I would like you to double this defendant's sentence because ten years ago he committed a robbery on me." The judge would, of course, decline with thanks the gratuitous recommendation, for it would obviously be hearsay, it would obviously not be authentic.

The Majority says that when Robert Hendrickson was 17 years of age he was punished "as the result of a burglary then committed by him." The Majority has no evidence that Hendrickson committed a burglary when he was 17. For a court to declare that anyone committed a burglary, there must be proof that he was tried under constitutional guarantees, that he had counsel, that he was confronted by his accusers, that only sworn evidence was used against him. These are guarantees which are unknown in juvenile court proceedings. The Majority may feel justified in saying that Hendrickson committed a burglary, but there is no authoritative court record to substantiate such a conclusion.

If the quarter sessions judge in Bucks County who sentenced Hendrickson in 1946 had stated that "Although I heard your case in juvenile court four years ago, I am not holding your juvenile court record against you because the statute does not permit me to do this," we would then be assured that Hendrickson merited the severe sentence he received in 1946 because the sentence would then have been based entirely on what he did as an adult. We know, however, from the undisputable transcript, that the quarter sessions judge not only did not attempt to exclude the juvenile court record from his consideration, but he went out of his way to announce that he was giving it specific and emphatic attention. This is what he said: "This Court tried to help you many years ago by placing you on probation when you were charged with burglary *as a boy*. You committed a serious crime there." It is as plain as language can express one's thoughts that he was punishing Robert Hendrickson because he was *charged* with burglary when he was a boy. And that is exactly what the statute says he may not do and should not do.

Moreover, we have no way at all of knowing that Robert actually committed a burglary when he was a boy. There was no trial, there was no verdict, there was no conviction. There was, as this Court denominated it in the *Holmes* case, a "civil inquiry." In that civil inquiry the judge may have listened to hearsay, he may have been impressed with ex parte statements, he may have been deceived by testimony which was not subjected to cross-examination, he may have read secret reports, he may, for many reasons, have been persuaded to place the boy on probation which reasons had nothing to do with any conclusion that the boy had actually committed a burglary.

The Majority cites *Holmes' Appeal,* 379 Pa. 599, as supreme authority for its position, but that case is the perfect example of the point I am making. Joseph Holmes was punished by the Juvenile Court of Philadelphia County for alleged participation in the robbery of a church. No one saw him rob a church, no one testified that he robbed a church. At the hearing a detective testified orally to an alleged confession by a third person who, he said, charged Holmes with involvement in the crime. The detective did not produce the confession, he did not produce the person alleged to have confessed, and the minor defendant was not given an opportunity to face the stranger who had supposedly implicated him. If such testimony had been presented in a court of quarter sessions it would have been laughed out of court. When Holmes grows up, if he should appear in criminal court as a defendant, his juvenile court record will, under the present decision of this Court, be produced to prove he was once a church robber! And yet, as a glance at the record will demonstrate, the evidence presented to support that charge would not be enough upon which to hang a starving mouse for "burglariously" nibbling at the timber of a pew.

This Court takes a position in this case which is indefensible in logic, insupportable in reason, inexcusable in law, and contrary to statute. It says that in juvenile court the Commonwealth is not bound by the rules of evidence because the youth is not under indictment, and yet, should he come into criminal court years later, the record made in juvenile court is treated as sacrosanct although it may be only a basket into which have been gathered, as I have heretofore indicated, hearsay, rumor, gossip, ex parte statements, secret reports, and all the other defective, unreliable bricabrac which are condemned in criminal

law and by the Constitution. It is this kind of reasoning which enables us to understand how judges in the early days of the common law believed, or professed to believe, that if an accused grasped a red hot iron and his skin was scorched thereby, this proved he was guilty.

The Majority Opinion enumerates the offenses committed by the defendant, in order to demonstrate that he has been a several times offender. There is no doubt that Hendrickson has not made a fetish of respecting the law, but that is no reason why the law should be disrespectful of his rights. No human being in America, regardless of what he has done or has been accused of doing, may be stripped of his constitutional prerogatives without endangering the liberties of the citizenry of the nation. For the courts to treat lightly a solemn promise made by the Commonwealth, through the medium of a statute, is scarcely the best way in which to win the respect and loyalty of potential lawbreakers.

The Majority concedes that "It would be unjust and illegal to allow the introduction of juvenile records or evidence given in juvenile cases to be later introduced as competent evidence in criminal cases or proceedings in any other court, in the same manner as criminal convictions or evidence taken in criminal proceedings may in certain instances be competent evidence in other criminal proceedings."

It argues, however, that Hendrickson's juvenile court record was not introduced as "evidence" because it was not used against him in a "trial." But the statute does not ban the record only in trials. It says that the record shall not be used "in any case or proceeding." Nor is the argument valid that a record is not evidence unless it is introduced for the purpose of ascertaining guilt. We all know that in first degree

murder cases, criminal records are introduced to assist the jury in determining, not guilt, but whether the penalty should be life imprisonment or death. Certainly such records are *evidence* in every sense of the word. What other designation could they have?

The Majority cites a New York case (*Williams v. New York*, 337 U.S. 241) to the effect that a sentencing judge should be supplied with "the fullest information possible concerning the defendant's life and characteristics." This is all well and good. It is indeed desirable that a judge should have before him all reliable information obtainable on the convicted defendant before he sentences him. But the Majority overlooks that in Pennsylvania our General Assembly has specifically said that it does not regard a juvenile court record of sufficient probative value to be introduced against a minor in subsequent proceedings and it has accordingly prohibited the use of such a record in any subsequent proceeding in any other court. The statute does not differentiate between what is to be produced during a trial and what is to be presented after a trial. If the Legislature had intended to exclude the record only from trials it could easily have said so, namely, "The disposition of a child or any evidence given against him in juvenile court shall not be admitted against the child in any trial in any other court." But it did not say that. It said that the record shall not be used in any "case or proceeding." The continuing indifference of this Court to this express mandate of the Legislature makes reference to that neglect necessary, and a repeated flying of the flag of distress imperative.

I would like to see this Court say definitely that it will not follow the wording of the statute or cease stating, as it said in the *Holmes* case, that: "No suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court."

To say that no criminality attaches to a juvenile court record and then use that record upon which to base an aggravated recidivist sentence, as was done in this case, is, in my view, inconsistent, contradictory, and stultifying.

It is this kind of reasoning which makes law so mysterious to the uninitiated and it is inevitable that with this kind of reasoning supporting the sentence in this case, I must

Dissent.