**[J-62-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CHIEF JUSTICE SAYLOR, JUSTICE WECHT, AND JUDGES COLINS, FRIEDMAN, LEADBETTER, BROBSON, AND STRASSBURGER**

| | | |
|---|---|---|
| JOHN J. DOUGHERTY, | : | No. 6 EAP 2015 |
| | : | |
| Appellant | : | Appeal from the Judgment of the |
| | : | Superior Court entered on 8/14/14 at |
| v. | : | No. 1333 EDA 2012 affirming the order |
| | : | entered on 4/11/12 in the Court of |
| KAREN HELLER, | : | Common Pleas, Civil Division, |
| | : | Philadelphia County at No. 00699 |
| Appellee | : | December Term 2009 |
| | : | |
| | : | ARGUED: May 9, 2016 |

***OPINION***

*PER CURIAM*                                              **DECIDED: June 14, 2016**

A special complement of the Supreme Court of Pennsylvania has been assembled to address multiple issues raised in the present appeal. These include a threshold objection to temporary judicial assignments to the Court and a challenge to a now-supplanted order that previously had dismissed the appeal. In addition, a jurisdictional question has been raised concerning whether a common pleas court's denial of a motion for a protective order seeking, in advance of a videotape deposition, to restrain any public dissemination constitutes a collateral order subject to as-of-right interlocutory appellate review. Finally, on the merits, a challenge is maintained to the common pleas court's refusal to issue a protective order proscribing such dissemination.

## I. Background

The underlying civil action is a defamation case arising out of a newspaper column written by the defendant, Karen Heller ("Appellee"), and published in the Philadelphia Inquirer in November 2009. The text encompassed negative commentary about purported actions of the plaintiff, John J. Dougherty ("Appellant"), who is the Business Manager of the International Brotherhood of Electrical Workers Local 98 and a self-described public figure and a participant in numerous civic and philanthropic activities.

When confronted with information demonstrating that the commentary concerning Appellant's conduct was false, Appellee conceded the unfoundedness and publicly apologized. The misinformation, however, appeared on Appellee's Facebook page for an indeterminate period of time after the apology and apparently remained available through third-party sources until several years later.[1]

Appellant commenced the present litigation a few weeks after the original publication. On February 15, 2012, Appellee served Appellant with a notice for his videotape deposition, *see* Pa.R.C.P. No. 4017.1 (permitting the taking of "[a]ny deposition upon oral examination . . . as a matter of course as a video deposition"), which was scheduled for one month later. Appellant and two of his attorneys appeared at the pre-designated time and place. Before the deposition could proceed, however, a controversy arose.

Appellant's attorneys expressed concern that video footage resulting from the deposition should not be displayed for any purpose beyond the litigation. The lawyers couched these concerns variously, explaining that they were based, in part, on their

---

[1] The specifics of the column, the apology, and the publications are developed in an *en banc* opinion of the Superior Court. *See Dougherty v. Heller*, 97 A.3d 1257, 1260 & nn. 1 & 2 (Pa. Super. 2014).

client's status as a public figure and upon the prior course of dealings between the Appellant, Appellee, and Appellee's media employer. *See, e.g.*, Statement dated March 16, 2012, in *Dougherty v. Heller*, No. 00699 Dec. Term 2009 (C.P. Phila.) ("N.T., Mar. 16, 2012"), at 23 (reflecting the observation of one of Appellant's attorneys that "[y]ou are the media and we're here because of what we contend to be malicious conduct by the media of a public figure"). Raising the potential for unjust and unreasonable embarrassment to their client, counsel indicated that they would require assurances that the videotape would not "be used for any other purpose or released to any other third parties outside of relationship with any filing in this case or court proceeding." *Id.* at 8-9; *see also id.* at 4-6, 10, 12.

Appellee's attorney, for her part, repeatedly indicated that she intended to use the videotape solely for purposes of the litigation, and that she would abide by all of her obligations under the Rules of Civil Procedure and the Rules of Professional Conduct. *See id.* at 6, 11-12, 16-17, 24-25, 30. She declined, however, to make the specific commitment that was asked of her. Counsel highlighted that she had given a month's notice of the deposition, but that no objections had been raised or particular conditions sought throughout the ensuing time period. In this vein, the attorney asserted that it was unreasonable for Appellant's lawyers to make special demands at the outset of a duly-noticed deposition. *See, e.g.*, *id.* at 9-10 (reflecting the remark by Appellee's counsel that she would not "agree to something when I haven't thought about it, I don't know what your concerns are, I haven't spoken to any of my clients").

Appellee's attorney then suggested an arrangement whereby the videotape deposition would proceed as planned, and she would agree not to give the tape to anyone for ten days, during which time Appellant could seek a protective order or other relief from the common pleas court. *See id.* at 12-13, 18-22. Furthermore, counsel

stated, if such a motion were to be filed, she would commit that there would be no dissemination of the video pending a court ruling. *See id.* at 24-25 ("I'm willing to agree that to go forward with the videotaped deposition, to have the deposition videotape remain basically in escrow until you get a ruling from Judge Allen[.]").

Appellant's lawyers, however, declined this proposal. *See, e.g., id.* at 23 ("[Y]ou do not have a right to go ahead with a videotape for trial purposes where you will not agree that it will only be used for those purposes and not turned over for the news media to broadcast on television."). In the discussion, one of Appellant's attorneys expressed, as follows, a reluctance to involve the common pleas court, because he foresaw that it was unlikely that a protective order would issue:

> [I]t's inappropriate to go to the judge and say hypothetically somebody may at some point ask [Appellee's counsel] for this tape or she may have an inclination to want to do something with this tape outside of legal proceedings. What do you think, Judge?
>
> And Judge Allen is going to say to me, just like every other judge, [c]ome to me when you have an issue.

*Id.* at 28.

Nevertheless, Appellant's counsel insisted upon a commitment that the video would not be released to any third party "for televising or whatnot," without permission from the common pleas court. *Id.* at 13. In the absence of an agreement on their specified terms, the attorneys would only permit their client to participate in the deposition if it were to proceed without videotaping. Since this was unacceptable to Appellee's counsel, s*ee id.* at 32-33, the deposition was aborted.

Appellee then filed a motion to compel the videotape deposition as authorized by Rule of Civil Procedure 4017.1. She highlighted that, under the rules, failing to participate in a video deposition may not be excused on the ground that discovery

sought is objectionable "unless the party failing to act has filed an appropriate objection or has applied for a protective order." *Id.* No. 4019(a)(2).

In addition, Appellee contended that a protective order was inappropriate, because Appellant had failed to meet the "good cause" standard under Rule of Civil Procedure 4012. *See* Pa.R.C.P. No. 4012(a) ("Upon motion by a party . . ., and *for good cause shown*, the court may make any order which justice requires to protect a party . . . from unreasonable annoyance, embarrassment, oppression, burden or expense[.]" (emphasis added)). At issue, she explained, was the deposition of a public figure in a case involving matters of public concern. In Appellee's view, speculative embarrassment from the mere possibility of dissemination of unknown content cannot constitute "good cause." In this regard, Appellee referenced several decisions of federal courts which had refused to enter protective orders, where the proponent failed to demonstrate "specific prejudice or oppression that will be caused by disclosure" or "concrete reasons justifying a protective order," as contrasted with "unverified fears." *Pia v. Supernova Media, Inc.*, 275 F.R.D. 559, 560 (D. Utah 2011); *cf. Condit v. Dunne*, 225 F.R.D. 113, 118 (S.D.N.Y. 2004) ("[W]hile sound bites are a recognized Achilles heel of videotaped depositions, the fact that the media may edit a tape that may or may not be released by the parties does not warrant a protective order barring all public dissemination of the videotape in this case." (citations omitted)).

Appellant responded with a cross-motion for a protective order. He emphasized that Appellee had admitted that she had made a false representation about him. Further, Appellant asserted that there was a long history of acrimony between Appellant and Appellee's media employer. Appellant continued to explain that none of the seventeen other depositions that had been noticed and/or conducted in the case was accomplished, or was sought to be undertaken, with video recording. In support of his

position, Appellant also referenced a series of federal and state decisions, although in these instances, protective relief was granted. *See, e.g.*, *Stern v. Cosby*, 529 F. Supp. 2d 417, 423 (S.D.N.Y. 2007); *Inhofe v. Wiseman*, 772 P.2d 389, 394 (Okla. 1989).

It was Appellant's position that there was good cause for protection under Rule 4012(a)(3) because:  there was "the distinct possibility" for misuse of the videotape given Appellant's status as a public figure and substantial involvement in public and political activities; the potential for mischief was heightened, in light of Appellee's status as a media representative and on account of the history and alleged acrimony; and the refusal of Appellee's counsel to acquiesce in Appellant's demand for a commitment "strongly suggest[ed] ulterior purposes for why defendant insists on videotaping plaintiff's deposition."  Plaintiff's Cross-Motion for Protective Relief in *Dougherty*, No. 00699 Dec. Term 2009, at 7-8.  Additionally, Appellant asserted that:

> the non-contextual, non-sequential film clips and sound bites from the plaintiff's [video]tape deposition could be particularly devastating given his public figure status, and as devastating to this specific pending litigation.  Because a public figure is unable to protect himself from these consequences due to his burden of proving actual malice, courts have held that protective relief must issue "[t]o prevent this type of malignment, and to prevent this case from being tried in the press[.]"  *Inhofe*, 772 P.2d at 393-94; and,
>
> There exists a very real possibility that if plaintiff's videotape deposition is released for non-litigation use, portions will be broadcast out of context and that these out-of-context, selected portions of the deposition could taint the potential jury pool in this case.

*Id.* at 8-9 (alterations adjusted).

Furthermore, citing, *inter alia*, to *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S. Ct. 2777 (1977), Appellant claimed a privacy right under the First

Amendment in the "non-disclosure of discovery not yet admitted into the judicial record of the underlying action." Plaintiff's Cross-Motion for Protective Relief in *Dougherty*, No. 00699 Dec. Term 2009, at 9 (citing *Nixon*, 433 U.S. at 457, 97 S. Ct. at 2797 (alluding to "the individual interest in avoiding disclosure of personal matters" (quoting *Whalen v. Roe*, 429 U.S. 589, 599, 97 S. Ct. 869, 876 (1977)))). Finally, Appellant contended that Appellee's counsel had an ethical obligation to refrain from providing material to third parties per Rule of Professional Conduct 3.6 (prohibiting attorneys participating in litigation from making an "extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter").

Following argument on the motions, the court of common pleas entered an order granting Appellee's motion to compel and denying Appellant's motion for protective relief. The court directed Appellant to appear for a videotape deposition within fifteen days.

Appellant proceeded to file a notice of appeal and to argue that, pending the appeal, the common pleas court was deprived of authority to proceed further with the case. This position was premised on the claim that Appellant had a right to pursue interlocutory appellate review under the collateral order doctrine. *See* Pa.R.A.P. 313(a) ("An appeal may be taken *as of right* from a collateral order of an administrative agency or lower court." (emphasis added)); *id.* 1701(a) (establishing the general rule that, "[e]xcept as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter").

After argument, the common pleas court determined that the appeal was not as of right and, accordingly, did not impede further proceedings. *See* Pa.R.A.P. 1701(d)

(authorizing courts of original jurisdiction to proceed further in any matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal). The court explained that, to be collateral, an order must meet the following requirements:

> (a) The order is separable from and collateral to the main cause of action;
>
> (b) The right involved is too important to be denied review; and
>
> (c) The question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

*Dougherty v. Heller*, No. 00699 Dec. Term 2009, *slip op.* at 3 (C.P. Phila. June 21, 2012) (citing Pa.R.A.P. 313(b)).

In this framework, the common pleas court initially couched the issue as "whether the plaintiff, a public figure, can dictate the manner and use of discovery pursued by his opponent based upon an unfounded concern as to how the discovery may be used outside the instant litigation." *Id.* Although the court believed that the potential abuse of a videotape deposition was separable from the merits, it did not accept that the issue was so important as to justify as-of-right interlocutory appellate review. In this regard, the court quoted *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547 (1999), for the proposition that "it is not sufficient that the issue be important to the particular parties[;] [r]ather it must involve rights deeply rooted in public policy going beyond the particular litigation at hand." *Id.* at 484, 729 A.2d at 552. The common pleas court did not find Appellant's assertions that "snipp[e]ts [of the videotape] could be used to make [Appellant] look ridiculous," and expressions of concern about Appellant's "gesticulations, breaks in the deposition where . . . he may, for instance, attend to his nasal passage," to represent matters deeply rooted in public policy. *Dougherty*, No. 00699 Dec. Term 2009, *slip op.*

at 4-5 (quoting N.T., Apr. 4, 2012, at 21). Rather, the court deemed these fears to be "rather attenuated," since they had yet to be realized, and, in any event, they appeared to the court to have little applicability beyond the present case. *Id.*

The common pleas court also did not believe that there was any irreparable loss, since the court accorded little weight to the described potential for embarrassment, while positing that "should the video become fodder to embarrass plaintiff, he has grounds for another lawsuit." *Id.* at 6. In discussing this subject, the court admonished that "[t]he plaintiff does not have a right to dictate the manner in which a party may pursue a course of discovery nor may a party unilaterally limit dissemination absent some compelling reason." *Id.*

In terms of the motion for a protective order, the common pleas court determined that Appellant had failed to establish "good cause" to support the requested relief under Rule 4012(a). The court explained as follows:

> For plaintiff to prevail on the motion for protective order, the Court must accept the likelihood a series of events will occur. First, the Court must find that the video will capture a gesture such as a tick or other inappropriate behavior which is extraneous and/or an extreme deviation from other public appearances by the plaintiff[,] a public figure. Second, plaintiff wants the Court to assume that someone will gain access to this video during the litigation process. Third, the video will be reviewed for embarrassing content. Fourth[,] the video will be altered by some form of cyber chicanery thereby enhancing the embarrassing tick or gesture. And lastly the Court is asked to assume the video will be published or otherwise disseminated resulting in "unreasonable embarrassment."
>
> Plaintiff acknowledges that any potential abuse of the video would not affect the merits of this case. Plaintiff admits that there are several defamatory lawsuits involving the plaintiff and the defendant's employer but fails to cite to any instance where such an abuse as presently feared has occurred.

> Additionally, plaintiff conceded that a number of safeguards existed to prevent the type of harm envisioned. The Court finds that entering a protective order under these facts will erode a litigant's right to conduct a deposition [by] video, a right which has been codified in Pa. R.C.P. § 4017.1(a).

*Id.* at 6-7 (footnote omitted).

Given the common pleas court's determination that no collateral order had issued, it once again directed Appellant to appear for deposition. A three-judge panel of the Superior Court, however, entered an order staying the proceedings pending the outcome of the appeal.

Ultimately, that panel agreed with Appellant that the common pleas court's ruling was embodied in a collateral order, but it nevertheless affirmed on the merits in a divided memorandum opinion. Appellant requested reargument *en banc*, however, which was granted, and the panel opinion was withdrawn.

The *en banc* Superior Court then affirmed in a divided, published opinion. *See Dougherty*, 97 A.3d at 1267. In terms of jurisdiction, the intermediate court unanimously found that the common pleas court's order was a collateral one subject to as-of-right interlocutory appellate review. Initially, the court recognized the general policy disfavoring piecemeal appeals and the concomitant understanding that "the collateral order doctrine is narrow." *Id.* at 1261 (citing *Melvin v. Doe*, 575 Pa. 264, 272, 836 A.2d 42, 46-47 (2003)). *See generally Rae v. Pa. Funeral Dirs. Ass'n*, 602 Pa. 65, 78-79, 977 A.2d 1121, 1129 (2009) (discussing the general final judgment rule and the status of the collateral order doctrine as a narrow exception which must be measured against the substantial downsides of piecemeal litigation). The court explained that it had nevertheless previously granted collateral order review of pretrial discovery orders in which an appellant's privacy interests were at stake. *See id.* at 1262 (citing *J.S. v.*

*Whetzel*, 860 A.2d 1112, 1117 (Pa. Super. 2004), and *Commonwealth v. Alston*, 864 A.2d 539, 546 (Pa. Super. 2004)).

The Superior Court recognized that Appellant had raised two distinct claims that should be assessed independently under the collateral order doctrine. These centered, first, upon the common pleas court's treatment of Appellant's overarching claim to a privacy right, and, second, on the finding that good cause was lacking to support issuance of a protective order. Nevertheless, the intermediate court ultimately found these claims to be "inextricably linked." *Id.* at 1263.[2]

Given the interrelatedness, the Superior Court focused its main line of reasoning on the privacy dynamic, which the court found to be clearly separable from his defamation claim. *See id.* at 1262. In this regard, the intermediate court explained that there was no need to examine whether a defamatory statement was made in addressing the privacy aspect. *See id.*

As to the importance criterion, the Superior Court alluded to "robust protections afforded privacy interests in Pennsylvania," and concluded that the right to privacy in pretrial discovery was within the categorization of rights that are too important to be denied review. *Id.* at 1262-63 (citation omitted). The intermediate court also found that the harm which would be occasioned by any loss of privacy would be irreparable, likening the deprivation to a defamation defendant's First Amendment right to anonymity or a litigant's property interest in a trade secret. *See id.* at 1263.

On the merits, however, the majority agreed with Appellee that the privacy interest asserted was not in and of itself controlling, and that Appellant had failed to

---

[2] As an aside, however, the court recognized that "a strong argument exists that Appellant's second issue, which merely questions the trial court's application of the good cause standard, raises factual considerations not well-suited to collateral review." *Id.*

demonstrate good cause to support the issuance of a protective order. Initially, the majority noted that Appellant had failed to identify adequately the origin or nature of this privacy interest. The majority recognized that Appellant was attempting to glean a constitutional right from *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S. Ct. 2199 (1984), *Stenger v. Lehigh Valley Hospital Center*, 382 Pa. Super. 75, 554 A.2d 954 (1989), and *MarkWest Liberty Midstream & Resources, LLC v. Clean Air Council*, 71 A.3d 337 (Pa. Cmwlth. 2013). The majority explained, however, that these cases focused on a trial court's authority to restrict a litigant or third party's access to discovery upon a showing of good cause, rather than upon the court's obligation to protect a party's privacy interest. *See Dougherty*, 97 A.3d at 1266. Accordingly, the majority determined that such decisions do not recognize a "compelling privacy interest" of any origin, and certainly not one of constitutional dimension. *Id.*

Rather, the majority found, the decision whether a privacy interest, of the order asserted by Appellant, is afforded protection in the discovery context appropriately rests upon a demonstration of good cause per Rule of Civil Procedure 4012. *See id.* Along these lines, the majority indicated:

> In our view, the "good cause" standard strikes an appropriate balance between competing interests, including a litigant's privacy interests (however they may be defined), the First Amendment freedoms of speech and access, and the court's obligations to administer justice efficiently and prevent abuse of the discovery process.

*Id.*

In terms of the good-cause assessment, the majority explained that Appellant had offered "little depth of analysis," in that he had failed to define "good cause," suggest an appropriate standard by which to evaluate it, or proffer any factual evidence to advance the contention, beyond references to statements of Appellee's counsel at

the thwarted deposition and the facts alleged in support of the defamation claim (including the assertion that Appellee and her media employer harbor animus). *Id.* The majority found it self-evident that more substantial evidence is required to support a protective order, which "must address the harm risked, and not merely an unsubstantiated risk of dissemination, as suggested by Appellant here." *Id.* at 1267. In this regard, the majority contrasted *Seattle Times* and *Stenger*, in which affidavits and particularized information had been presented. *See id.* (citing *Seattle Times*, 467 U.S. at 26, 104 S. Ct. at 2204, and *Stenger*, 382 Pa. at 86-87, 554 A.2d at 959). According to the majority, Appellant had offered nothing of comparable substance to suggest that the common pleas court had abused its discretion in declining to award protective relief.

Judge Mundy, joined by President Judge Emeritus Ford Elliott, filed an opinion concurring in the jurisdictional ruling but dissenting on the merits. In the latter portion of the responsive opinion, Judge Mundy initially acknowledged that the abuse-of-discretion standard governing appellate review of discretionary rulings of courts of original jurisdiction is a demanding one. *See Dougherty*, 97 A.3d at 1268 (Mundy, J., concurring and dissenting) (recognizing that "[a]n abuse of discretion exists when the [trial] court has reached a conclusion which overrides or misapplies the law, or when the judgement exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." (quoting *Middletown Twp. v. Lands of Stone*, 595 Pa. 607, 613 n.3, 939 A.2d 331, 335 n.3 (2007) (interlineation in original)).

In the ensuing analysis, however, Judge Mundy credited Appellant's position that the resistance by Appellee's attorney to enter into a commitment to limit the use of the videotape deposition raised substantial concerns regarding counsel's own intentions. *See id.* at 1272. Judge Mundy also ascribed relevance to the fact that the deposition of Appellant was the only one in the case to have been slated for video recording. *See id.*

Furthermore, Judge Mundy found that the history of litigation between Appellant and Appellee's media employer -- as well as Appellant's misrepresentation in her column and failure immediately to remove the commentary from her Facebook page and take measures to facilitate removal from third-party sources -- also demonstrated the potential that the videotape deposition might be misused to cause "unreasonable annoyance, embarrassment, oppression, burden or expense" to Appellant. *Id.* at 1272-73 (quoting Pa.R.C.P. No. 4012(a)); *see also id.* at 1273 ("In my mind, the form of the underlying action, coupled with Appellee's predisposition to disseminate Appellant's deposition for non-litigation purposes and the parties' cantankerous relationship, necessitates a minimally intrusive Rule 4012 protective order."). As such, the dissent characterized the common pleas court's approach as entailing "manifestly unreasonable judgment." *Id.* at 1274.

Appellant sought discretionary review from this Court of the *en banc* Superior Court's order, which was granted in February 2015. *See Dougherty v. Heller*, ___ Pa. ___, 109 A.3d 675 (2015) (*per curiam*). Oral argument was scheduled, in the ordinary course, for the Court's September 2015 session.

In August 2015, Appellee sent letters to two Justices suggesting that they should consider recusing themselves from participation in the appeal for various reasons. Subsequently, three Justices recused, which, in view of two preexisting vacancies on the Court, left only two Justices eligible to hear and decide the matter. In these circumstances, the matter was continued, and accordingly, was removed from the Court's September session list.

On October 29, 2015, the two Justices who remained eligible to participate entered an order dismissing the appeal as having been improvidently granted.

Appellant filed a timely application for reargument under Rule of Appellate Procedure 2542. Appellant asserted that a two-Justice order is unauthorized, since, in Appellant's view, judicial action by the Supreme Court requires a quorum of four Justices. In this regard, Appellant relied upon Rule of Appellate Procedure 3102(d)(1) ("Any judicial matter heard or considered by a quorum of an appellate court may be determined by action of a majority of the judges who participated in the hearing or consideration of the matter."), and Section 326(a) of the Judicial Code, 42 Pa.C.S. §326(a) ("A majority of the Supreme Court shall be a quorum of the court."); *see also* 210 Pa. Code §63.11; Pa.R.A.P. 3102(a); Supreme Ct. IOP §11. Based upon these sources of authority, Appellant contended that four Justices are required to constitute a proper quorum.

It was Appellant's position that the two vacancies on the Court did not reduce the number of Justices required to assemble a quorum, nor could recused Justices be counted. Additionally, Appellant explained that a remedy to satisfy the quorum requirement, in the extraordinary circumstances presented and otherwise, is provided by statute. Specifically, Appellant highlighted the following provision from the Judicial Code:

> Inability to assemble a quorum. – Where by reason of vacancy, illness, disqualification or otherwise it is impossible to assemble a quorum of a court at the time and place appropriate therefor, sufficient judges shall be temporarily assigned to the court to permit the court to hold a duly convened session and transact the business of the court.

42 Pa.C.S. §326(c). Appellant maintained the central premise that, once the duly-convened Court had exercised its discretionary authority to allow an appeal, only an order issued by a majority of a quorum of the Court could dismiss it. Thus, according to

Appellant, the action of only two Justices in entering an order of dismissal was *ultra vires*, and the order itself void *ab initio*.

Appellee opposed reargument, taking the position that the quorum requirement is determined as of the time of a case's commencement in the Court. For this proposition, Appellee referenced Justice (and later Chief Justice) Cappy's opinion in *In re Larsen*, No. 155 JIRB Dkt. 1992 (Cappy, J., Jan. 22, 1993). *See id.* at 3 n.2 ("[I]t has long been established that where a majority of the members of the Court decline to hear a case, the power to decide the issue falls upon the remaining member or members of the Court."). Appellee explained that Justice Cappy had relied upon the single-Justice opinion in *Commonwealth ex rel. Carson v. Mathues*, 210 Pa. 372, 59 A. 961 (1904), for the stated proposition. *See id.* at 422, 59 A. at 980 (positing that where only "one judge is wholly free from interest, and, by force of this fact, the powers of the court necessarily devolve upon him"). Accordingly, while recognizing that Justice Cappy's opinion was not binding upon the Court, Appellee contended that the noted principle was otherwise embodied in precedent.

On December 29, 2015, two Justices entered an order granting reargument and supplementing the questions presented with the following query:

> Where allowance of appeal occurs on the votes of five Justices, but three Justices recuse prior to the case being presented on the merits via oral argument or submission on the briefs, does jurisdiction lie for the remaining two Justices to dismiss the case as having been improvidently granted?

Subsequently, per Rule of Judicial Administration 701(C), the Chief Justice tendered a request to the Court Administrator of Pennsylvania for recommendations for temporary judicial assignments to the Supreme Court to hear and consider the appeal under the terms of the reargument order. *See* Pa.R.J.A. No. 701(C)(1) ("Whenever a president judge deems additional judicial assistance necessary for the prompt and

proper disposition of court business, he or his proxy shall transmit a formal request for judicial assistance to the Administrative Office."); *id.* No. 701(C)(2) ("Upon the recommendation of the Court Administrator, the Chief Justice may, by order, assign any retired, former, or active . . . judge . . . to temporary judicial service on any court to fulfill a request by a president judge, or to reduce case inventories, or to serve the interest of justice."). The Court Administrator consulted with the President Judges of the Superior and Commonwealth Courts to identify jurists who were able and willing to assist, then implemented a randomized selection process to narrow the field to the five judges who are presently participating. The Chief Justice then entered a formal order of appointment on the Judicial Administration Docket, which was furnished to the litigants.

In the meantime, Appellant's counsel wrote to Justices individually objecting to the use of the Rule 701(C) procedure, followed by the filing of a formal application for relief maintaining such challenge. It was Appellant's position that Rule 701(C) simply does not address temporary assignments to assemble a quorum on the Supreme Court, in that it only authorizes requests from "a president judge" and contains no reference to a quorum requirement or the Supreme Court. Appellant also complained that the Chief Justice had requested recommendations of "up to five" temporary assignments, but there is no authority concerning how many assignments can or should be made in the absence of a quorum.

On account of the foregoing, Appellant suggested that the Court might wish to consider adopting formal and specific procedures for the temporary assignment of judges in instances in which it is otherwise impossible to assemble a quorum of the Supreme Court, "rather than shoehorning such cases into an existing rule designed to address other courts and circumstances." Appellant's Application for Relief Pursuant to Pa.R.A.P. 123 Regarding the Temporary Assignment of Judges ("Application for Relief")

at 2-3.  Referencing Article V, Section 16(c) of the Pennsylvania Constitution -- which provides that "[a] former or retired justice or judge may, with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court[,]" PA. CONST. art. V, §16(c) -- Appellant also posited that the temporary assignment of former or retired Justices would serve as a mechanism to "alleviate conflicts or concerns that could arise with the assignment of sitting judges on other courts."  Application for Relief at 3.  Alternatively, it was Appellant's position that the temporary assignment of jurists to the Supreme Court should await the adoption of formal procedures specifically addressed to this Court.

Appellee, for her part, opposed the requested relief.  She asserted that the Rules of Judicial Administration expressly permit the Chief Justice to make temporary judicial assignments, upon the Court Administrator's recommendations, where doing so would promote the interests of justice.  *See* Pa.R.J.A. No. 701(C)(2).

## II.  Temporary Judicial Assignments to the Supreme Court

We begin our review with the application for relief contesting the temporary judicial assignments to this Court, which will be denied for the following reasons.

Article V, Section 10(a), of the Pennsylvania Constitution expressly empowers the Supreme Court to temporarily assign judges from one court to another "as it deems appropriate."  PA. CONST. art. V, §10(a).  Consistent with this constitutional authorization, the Judicial Code also empowers the Supreme Court to promulgate general rules under which a judge may be temporarily assigned to another court and there to "hear and determine any matter with like effect as if duly commissioned to sit in such other court."  42 Pa.C.S. §4121(a).  This general authority has particular application when, "by reason of vacancy, illness, disqualification or otherwise[,] it is impossible to assemble a quorum of a court."  *Id.*  §326(c).

Rule 701(C) of the Rules of Judicial Administration is a general rule promulgated by the Supreme Court precisely to execute its constitutional and statutory powers to temporarily assign judges to other courts "as it deems appropriate." PA. CONST. art. V, §10(c). The rule authorizes the Chief Justice to enter an order assigning any retired, former, or active judge to temporary judicial service on "*any* court," *inter alia*, to serve the interests of justice. *See* Pa.R.J.A. No. 701(C)(2) (emphasis added).

That Rule 701(C) should apply to this Court was made plain in *Commonwealth v. Wetton*, 538 Pa. 319, 648 A.2d 524 (1994). There, a former appointed Justice and retired elected judge of the Superior Court, Frank Montemuro, who was certified for senior judicial service under Rule of Judicial Administration 701, had been assigned by order of the Supreme Court to serve temporarily as a member of the Court in the capacity of a "Senior Justice" to fill the place of a temporarily suspended commissioned justice. That assignment was made pursuant to Article V, Sections 10(a) and 16(c), of the Constitution, Section 4121 of the Judicial Code, and Rule 701 of the Rules of Judicial Administration.

In rejecting a challenge to the legal validity of Senior Justice Montemuro's participation in an appeal, the Supreme Court explored its authority to make judicial assignments under the Constitution, statute, and court rules. The Court ruled specifically that the procedure that is now found in Rule 701(C)(1) and (2) (at that time prescribed by Rule 701(d) and (e)), controls the assignment of a temporary justice to the Supreme Court. *See Wetton,* 538 Pa. at 326, 648 A.2d at 527 ("Pa.R.J.A. [No.] 701 is controlling."). Pointedly, the Court in *Wetton* observed that the Chief Justice is regarded as "the president judge of the Supreme Court" for purposes of Rule 701. *See id.* at 326 n.3, 648 A.2d at 527 n.3. For these and other reasons, the

Supreme Court ratified the legal propriety of its assignment of Senior Justice Montemuro for temporary service on the Court in accordance with Rule 701.

Rule 701(C) is equally applicable in this circumstance, namely, to assign judges as temporary members of the Supreme Court for the purpose of fulfilling quorum requirements to consider and dispose of a specific matter. Nothing in Rule 701(C) would warrant any different application of the rule in this circumstance than was accorded in the temporary assignment of Senior Justice Montemuro in 1994. Consequently, there is no reason for the Court to employ a different procedure or hold the present appeal in abeyance, as suggested by Appellant. Rather, under Article V, Sections 10(a) and 16(c), of the Constitution, Sections 326(c) and 4121 of the Judicial Code, Rule 701(C) of the Rules of Judicial Administration, and *Wetton*, it was appropriate to follow the procedures prescribed by the rule for the purpose of fulfilling the quorum requirements necessary for the Court to consider and determine the pending appeal. That process was commenced properly through a request made to the Court Administrator on March 30, 2016, culminating in the ensuing, valid order of temporary appointment entered by the Chief Justice.[3]

### III. The Sustainability of the Dismissal Order

In the supplemental briefing, Appellant maintains that two Justices lacked the authority to enter the order dismissing his appeal as having been improvidently granted. Appellant reiterates his position that statutory laws, the Rules of Appellate Procedure, the Supreme Court's Internal Operating Procedures, long-established rules of order,

---

[3] To the degree that Appellant complains of the temporary appointment of five judges (instead of perhaps the two necessary to comprise a quorum), the advisability of a larger Court complement assigned to these already protracted appeal proceedings -- to guard against the possibility of further unanticipated eventualities -- would seem to be self-evident.

and common sense all dictate that a validly authorized appeal cannot be dismissed on the authority of less than a quorum. Appellant also rejects the position of Justice Cappy in the *Larsen* matter and the single-Justice opinion in *Mathues* as inconsistent with such controlling authority.

More specifically, according to Appellant, Section 326(c) of the Judicial Code makes clear that a quorum is required in order to "transact the business of the court," 42 Pa.C.S. §326(c), which by definition includes actions taken by the Court on the appeal after commencement. Furthermore, Appellant stresses that the statute furnishes a remedy in the form of temporary judicial appointments to address circumstances in which the Court is unable to assemble a proper quorum. *See id.* Appellant references *Commonwealth v. Petrillo*, 340 Pa. 33, 16 A.2d 50 (1940), for the proposition that the number of the Court cannot be "reduced below that legally required for the transaction of its business." *Id.* at 48, 16 A.2d at 58. Appellant also cites *United States v. Aluminum Co. of America*, 320 U.S. 708, 64 S. Ct. 73 (1943) (*per curiam*), as an instance in which the Supreme Court of the United States postponed decision until such time as a quorum would be present. *See id.* at 708-09, 64 S. Ct. at 73.

Appellant takes the position that both Justice Cappy's opinion in the *Larsen* matter, and the single-Justice decision in *Mathues* upon which Justice Cappy relied, are non-precedential and unpersuasive. *See, e.g.*, Supplemental Brief for Appellant at 11 (citing *Mountain States Telephone & Telegraph Co. v. People ex rel. Wilson*, 190 P. 513, 520 (Colo. 1920) (Scott, J., dissenting), for the proposition that *Mathues* "is so unreasonable as to make it stand out in our jurisprudence as a monstrosity"). As to *Mathues*, Appellant also explains that the decision pre-dated the enactment of Section 326 of the Judicial Code, and accordingly, he takes the position that the case has been superseded in any event.

Appellant references Robert's Rules of Order and other authorities for the proposition that the purpose of a quorum requirement is for "protection against totally unrepresentative action in the name of the body by an unduly small number of persons." Supplemental Brief for Appellant at 12 (quoting ROBERT'S RULES OF ORDER, NEWLY REVISED §3 (11th ed. 2013)); *see also* Jonathan Remy Nash, *The Majority That Wasn't: Stare Decisis, Majority Rule, and the Mischief of Quorum Requirements*, 58 EMORY L.J. 831, 837 (2009) (indicating that "[a] quorum requirement answers the question of how many judges are necessary for the court, officially, to take any action at all").

Finally, Appellant notes that the supplemental issue set forth in the reargument order was framed in terms of jurisdiction. Appellant, however, specifically disclaims the presence of a jurisdictional concern. Rather, it is Appellant's position that "the issue is really one of the authority to act." Supplemental Brief for Appellant at 7 n.3.

Appellee, on the other hand, relies primarily on the arguments presented in her response to Appellant's application for reconsideration, supplemented by what she regards to be logical flaws in, and problematic corollaries and consequences of, Appellant's supplemental arguments.

Initially, we consider, briefly, the significance of Appellant's position that the issue presented is not a jurisdictional matter. Certainly, to the degree that jurisdiction is in issue, the statutory commands in Section 326 of the Judicial Code are preeminent. In this regard, our Constitution's Article V, Section 10(c) allocates the power to prescribe rules governing practice, procedure and the conduct and administration of all courts, but subject to "the right of the General Assembly to determine *the jurisdiction* of any court." PA. CONST. art. V, §10(c) (emphasis added).

To the degree that the matter of the authority of two Justices to act on the Court's behalf is not a jurisdictional concern, however, Article V, Section 10(c) allocates to this

Court's own prerogatives the power to regulate the conduct and administration of courts, discernments which the Court has determined to be exclusive. *See, e.g.*, *In re 42 Pa.C.S. §1703*, 482 Pa. 522, 529, 394 A.2d 444, 448 (1978). Notably, this Court exercised its authority over judicial administration in 1978 -- in a manner which greatly impacted quorum requirements -- when it authorized the Superior Court to sit in three-judge panels to administer its extensive workload. *See Commonwealth v. Roach*, 307 Pa. Super. 506, 514, 453 A.2d 1001, 1005 (1982) (setting forth the text of the Court's order).

In any event, we find Section 326 of the Judicial Code to be materially consistent with this Court's own rulemaking pronouncements in relevant respects. *Compare* 42 Pa.C.S. §326(a) ("A majority of the Supreme Court shall be a quorum of the court."), *with* Supreme Ct. IOP §11 ("A majority of the Court shall be a quorum of the Court."). The question remains, however, of what is meant by "the Supreme Court" and "the Court" in all of these sources of authority, *i.e.*, whether these references are to the entire authorized membership, or to a lesser complement of all sitting Justices irrespective of vacancies.

Appellant suggests that the answer can be found in Section 501 of the Judicial Code, which provides that "[t]he Supreme Court of Pennsylvania shall consist of the Chief Justice of Pennsylvania and six associate justices." 42 Pa.C.S. §501; *accord* PA. CONST. art. V, §2(b). We note, however, that this language does not explicitly designate the reference point from which a quorum is to be determined or establish a particularized quorum requirement, as occurs in the statutory authority of many other jurisdictions. *See, e.g.*, 28 U.S.C. §1 ("The Supreme Court of the United States shall consist of a Chief Justice of the United States and eight associate justices, *any six of whom shall constitute a quorum.*") (emphasis added); *id.* §46(d) ("A majority of the

number of [federal circuit court] judges authorized to constitute a court or panel thereof . . . shall constitute a quorum."); I LL. C ONST. art. VI, §3 ("Four Judges constitute a quorum and the concurrence of four is necessary for a decision."); C AL. C ONST. art. 6, §2 (providing that "[c]oncurrence of 4 judges present at the argument is necessary for a judgment," setting an effective quorum requirement of four judges). Indeed, in some venues, the number of sitting Justices is, in fact, determinative. *See, e.g.*, I.C.A. §602.4101 ("A majority of the justices *sitting* constitutes a quorum, but fewer than three justices is not a quorum." (emphasis added)).

For these reasons, we find the statute, and our own internal operating procedure, to be ambiguous. There would appear to be no intention, in either, to depart from the "almost universally accepted" common law principle, which provides that, "a majority of a quorum constituted of a simple majority *of a collective body* is empowered to act for the body." *F.T.C. v. Flotill Prods., Inc.*, 389 U.S. 179, 183, 88 S. Ct. 401, 404 (1967) (emphasis added). Nevertheless, even within the common law, the term "collective body" would seem to be ambiguous in terms of whether it refers to the fixed number of the full membership or the complement of sitting members. *See* J ON E RICSON, N OTES AND C OMMENTS ON R OBERT'S R ULES 158 (3d ed. 2004) (alluding to scholarly debate along these lines).

The more conservative approach, which we now find to be appropriate, is to determine the quorum according to the Court's full authorized complement.[4] This better

---

[4] *Accord, e.g.*, *Negri v. Slotkin*, 244 N.W.2d 98, 99 (Mich. 1976) (explaining that four of seven Justices of the Michigan Supreme Court constitute a quorum, while also discussing the court's recent passage, through an extended period of time, without a full complement of Justices); Nash, *The Majority That Wasn't*, 58 E MORY L.J. at 844 (characterizing the federal statute establishing the quorum requirement for federal courts of appeals as "[a] majority of the number of judges authorized to constitute a court or panel thereof" as an embodiment of the common law quorum rule (quoting 28 U.S.C. §46(c))); *cf. Lymer v. Kumalae*, 29 Haw. 392, 414 (1926) (recognizing a split of (continued…)

serves to increase the chance that the decision of the Justices participating in any given case will be seen as representative of the collective body, thus enhancing the legitimacy of the result, the decision-making process, and the Court itself.  *See* Nash, *The Majority That Wasn't*, 58 EMORY L.J. at 840-41 (citing, *inter alia*, Luther Cushing, RULES OF PROCEEDING AND DEBATE IN DELIBERATIVE ASSEMBLIES 20 (Boston, Thompson, Brown & Co. rev. ed. 1879)).[5]  Although affirmation of the expressions from *Larsen* and *Mathues* would promote expediency, we agree with Appellant that the approach lacks an adequate foundation in law and policy.

Appellant also correctly highlights that Court business need not come to a standstill if a quorum is not immediately present, since authority is vested in the Chief Justice to effectuate temporary assignments, *see* Pa.R.J.A. No. 701(C), as has occurred here.

---

(…continued)
authority concerning quorum requirements pertaining to local government bodies, but concluding that "a majority of all of the members of the board means a majority of all the members *provided by law* and not a majority of the members existing at the time action is taken" (emphasis added)); 73 C.J.S. PUBLIC ADMINISTRATIVE LAW AND PROCEDURE §45 (2016) ("Unless otherwise prescribed, the total number of members on a board is not reduced by an abstention, resignation, or vacancy.").  *But see* MASON'S MANUAL OF LEGISLATIVE PROCEDURE §501.1 (2010) ("[W]hen there is a vacancy, unless a special provision is applicable, a quorum will consist of the majority of the members remaining qualified.").

[5] *Cf. State v. Doe A*, 297 P.3d 885, 888 (Alaska 2013) (discussing the import of Alaska's Appellate Rule 106(b), which provides that "[i]n an appeal that is decided with only three of five supreme court justices participating, any issue or point on appeal that the court decides by a two-to-one vote is decided only for purposes of that appeal, and shall not have precedential effect").

Thus, we hold, in the absence of express governing authority to the contrary, that a quorum of the Supreme Court is four Justices.[6] Perhaps the dismissal of the present appeal might have been accomplished by three Justices, were there three remaining eligible to vote. *See* Pa.R.A.P. 3102(d)(1) ("Any judicial matter heard or considered by a quorum of an appellate court may be determined by action of a majority of the judges who participated in the hearing or consideration of the matter.").[7] Since the decision was made by only two Justices, however, we find it to have been in error.

The above gives rise to a conceptual issue surrounding the grant of reargument by two Justices. Here, we treat the reargument order as being essentially superfluous, since the preceding directive of dismissal should be deemed a nullity in the first instance.

In response to the dissenting portion of Judge Strassburger's responsive opinion, we strongly disagree with his position that the present, fully authorized complement of the Supreme Court should not decide the quorum issue here and now. Obviously, quorum concerns are more likely to arise given recent turnover on the Court and the concomitant fact of judicial elections and the inevitable fundraising activities they entail. Additionally, such concerns, of course, do not surface whenever a majority of Justices is available to decide cases. Accordingly, it seems most likely that, if the legal issues

---

[6] Notably, various procedural rules overtly establish a fairly limited range of circumstances in which decisions may be made upon lesser forms of participation. *See, e.g.*, Pa.R.A.P. 123(e) (providing for single-Justice rulings in certain contexts); *id.* No. 3315 (same).

[7] *Cf.* 59 AM. JUR. 2D, PARLIAMENTARY LAW, §10 (1987) (indicating that "[i]n the absence of an express regulation to the contrary, when a quorum is present a proposition is carried by a majority of the votes cast, and it is not necessary that at least a quorum cast votes, since the exercise of law-making power is not stopped by the mere silence and inaction of some who are present." (footnotes omitted)).

attending the quorum requirements are going to be authoritatively decided at all by the Supreme Court by at least by a quorum of jurists, it will be in a setting in which there have been temporary assignments. Along these lines, the fact that the quorum question has avoided authoritative resolution in the decisional law throughout history in Pennsylvania should serve to illustrate its elusive character.

We also do not regard our present decision as dictum. Appellant's objection to the lack of a quorum supporting the dismissal order was specifically framed, in the reargument application, as the basis why the appeal should be resurrected. Indeed, as reflected in the Court's ensuing order, reargument was granted precisely to resolve that matter. Although in retrospect -- and with the hindsight deriving from our present review -- we are now able to regard the dismissal order as void, absent the two-Justice grant of reargument, such invalidity would have remained entirely theoretical and dormant.

In other words, the proceedings flowing from the two-Justice dismissal and subsequent reargument orders have had real world consequences, as does our decision here. Thus, we reject Judge Straussberger's contention that those consequences -- or even the interest in providing a definitive explanation for *why* the appeal has survived the dismissal -- are insufficient to support a resolution.[8]

---

[8] In rejoinder, Judge Strassburger criticizes this opinion for ignoring the fact that the full elected complement of Supreme Court Justices may address the quorum issue through rulemaking. In point of fact, as discussed above, the Court already has done so. *See* Pa.R.A.P. 3102 (entitled "Quorum and Action"); Supreme Ct. IOP §11 (captioned "Quorum"). While certainly the rules could be clarified to elaborate on the quorum requirement, the decision in this case represents a material and necessary advancement of the jurisprudence in this area of the law that bears on the parameters of the Court's rulemaking authority.

In this regard, per our decision, the elected Justices of the Supreme Court could not, consistent with Section 326 of the Judicial Code, modify the rules to embrace the "last-judge-standing" approach reflected in *Mathues* and favored by Justice Cappy, absent an overruling of this decision or a determination that Section 326 is invalid (given our

(continued…)

Finally, we also differ with Judge Strassburger's position that some form of modesty, as depicted in his opinion through fairytale imagery, should restrain the judges who have been temporarily assigned to the Supreme Court from performing one of the main functions they were summoned to undertake.

### IV. Application of the Collateral Order Doctrine

Although the jurisdictional issue centered upon the application of the collateral order doctrine was not presented in the petition for allowance of appeal, Appellee raised it in her a counter-statement of jurisdiction in her original brief.[9] She emphasizes that the collateral order doctrine "is to be interpreted narrowly, and each prong . . . must be clearly present." Brief for Appellee at 1 (quoting *Vaccone v. Syken*, 587 Pa. 380, 384, 899 A.2d 1103, 1106 (2006), *superseded on other grounds by* Pa.R.A.P. 1114(b)(7)).

Appellee further maintains that the order of the court of common pleas fails the separability prong, because the issue, as framed by Appellant, "wades into the merits of his defamation case." *Id.* She explains:

> [Appellant] argues that the same alleged defamation and animus that he asserts as the basis for his lawsuit constitute good cause for the protective order he seeks. He has thus inextricably intertwined this discovery dispute with the merits, making the same facts relevant to both.

*Id.* at 2.

---

(…continued)
determination that Section 326 and the existing rules generally require at least a majority of a quorum of four to support decision-making on the part of the Supreme Court).

[9] Given the jurisdictional dynamic, this approach to putting the issue forward is sound, since the matter is within the scope of appropriate *sua sponte* judicial review in any event. *See Commonwealth v. Shearer*, 584 Pa. 134, 138 n.4, 882 A.2d 462, 465 n.4 (2005).

In terms of importance, it is Appellee's position that, "although [Appellant] styles his appeal as championing litigants' privacy interests in pre-trial discovery, his appeal fails the importance prong because litigants for decades have been well-served by the Rules as they exist, and what is really at issue is whether [Appellant's] own unique circumstances warrant a protective order here." *Id.* Appellee references *Geniviva v. Frisk*, 555 Pa. 589, 725 A.2d 1209 (1999), as an instance in which this Court found that an appeal failed to meet the importance prong. *See id.* at 599, 725 A.2d at 1214 (holding that an order denying of a motion to approve a settlement under Section 3323 of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S. §3323, did not meet the importance criterion of the collateral order doctrine).

Finally, Appellee asserts that Appellant cannot establish that his claimed right will be irreparably lost absent the appeal. She explains that Appellant's counsel will have the opportunity to lodge appropriate objections at a deposition and, if necessary, make appropriate motions afterwards for protection based upon concrete information rather than conjecture. She concludes:

> If [Appellant's] videotaped deposition proceeded, it is pure speculation that he would have lost anything; nothing private may have been asked, and if it were, counsel may have agreed to protect a portion of the video, or the court could have ordered a portion sealed. This appeal is not only interlocutory, it's premature.

Brief for Appellee at 3.

Appellant's response is substantially consistent with the *en banc* Superior Court's holding, namely, that the assertion of privacy interests relative to a videotape deposition presents a separable, important controversy, as to which the concern will be irreparably impaired. Appellant maintains that, even if no improper questions are asked at the deposition, Appellee "and her counsel would nonetheless have the ability to embarrass

[Appellant], making him look foolish through selective editing and splicing of the videotaped deposition." Reply Brief for Appellant at 7 (citing *Cosby*, 529 F. Supp. 2d at 422 (noting that "videos can more easily be abused as they can be cut and spliced and used as 'sound bites' on the evening news" (internal quotations omitted))). Appellant also cites *Cooper v. Schoffstall*, 588 Pa. 505, 510 n.3, 905 A.2d 482, 485 n.3 (2006), in support of the proposition that Pennsylvania courts routinely have held that discovery orders implicating important privacy rights are immediately appealable.

At the outset, we respectfully differ with the *en banc* Superior Court's position that the mere assertion of a privacy interest related to discovery should be found to implicate as-of-right interlocutory appellate review. As Appellee stresses, the collateral order doctrine is to be administered narrowly, in a manner which does not unduly undermine the general policy against piecemeal appeals. *See Rae*, 602 Pa. at 78-79, 977 A.2d at 1129. Although the civil procedural rules clearly protect against unreasonable annoyance and embarrassment, *see* Pa.R.C.P. Nos. 4011(b), 4012(a), to accept that claims of such order give rise to as-of-right appeals at the pretrial stage would undermine the policies favoring an initial, unitary resolution at the trial level. Couching the interest in being free from annoyance and embarrassment in terms of privacy does not alter this assessment.

Accordingly, we cannot accept that *any* assertion of an attendant privacy concern should transform a discovery order that otherwise is not appealable by right into a collateral order subject to as-of-right interlocutory appellate review. Instead, we find that the specific privacy concern in issue must be evaluated and adjudged to satisfy the importance requirement. In this regard, we make the distinction among different orders of privacy interests, such as those of a constitutional magnitude or recognized as such

by statute, as compared with lesser interests.[10]   Again, we believe that a contrary approach would unduly impinge upon the general final judgment rule.  *See id.*[11]

In this regard, none of the specific privacy interests recognized by this Court or the Supreme Court of the United States are implicated by the prospective deposition in

---

[10] The *Cooper* decision cited by Appellant, for example, involved a privacy interest in information contained in federal tax returns.  *See Cooper*, 588 Pa. at 508-09, 905 A.2d at 485.  Such information is made confidential per federal statute.  *See* 26 U.S.C. §6103(a).  *See generally Taylor v. United States,* 106 F.3d 833, 835 (8th Cir. 1997) (explaining that "[u]nder the [Internal Revenue Code], federal tax '[r]eturns and return information shall be confidential' and are not subject to disclosure under ordinary circumstances." (quoting 26 U.S.C. § 6103(a))).  This was also the relevant concern in the *J.S.* decision cited by the *en banc* Superior Court.  *See J.S.,* 860 A.2d at 1115.

The *Alston* decision, cited by the intermediate court, involved "important *constitutional* privacy rights of [a] child victim," *Alston*, 864 A.2d at 545 (emphasis added), also contrasting sharply with the present scenario in which the majority of the Superior Court determined that no rights of a constitutional dimension are presently in issue.  *See Dougherty*, 97 A.3d at 1266.

Notably, in *Commonwealth v. Williams*, 624 Pa. 405, 86 A.3d 771 (2014), the Court recently undertook to reinforce the high collateral order threshold -- even in the context of an order of a variety that otherwise would have qualified categorically (*i.e.*, an order in derogation of a privilege claim premised on the work product doctrine) -- explaining "the collateral order doctrine is to be narrowly construed in order to buttress the final order doctrine and in recognition that a party may seek an interlocutory appeal by permission pursuant to Appellate Rule 312."  *Id.* at 421, 86 A.3d at 780.

[11] We acknowledge that "importance" is necessarily imprecise.  As with other judgments which must be made in determining jurisdiction, the assessment entails an exercise in discernment, measured against the developing case law.  *Accord EQT Prod. Co. v. DEP*, ___ Pa. ___, ___ n.7, 130 A.3d 752, 758 n.7 (2015) (making this point relative to the standards governing the availability of declaratory relief).  This irremediable uncertainty relative to certain varieties of orders counsels in favor of also pursuing the permissive appeal track as a protective measure.  *See* DARLINGTON, MCKEON, SCHUCKERS & BROWN, 20 WEST'S PA. PRAC., APPELLATE PRACTICE §313.1 (2015) ("In analyzing orders that may be appealable under the 'collateral order' doctrine, if there is any doubt as to whether an order is appealable as a collateral order, both a petition for permission to appeal and a notice of appeal should be filed.").

this case. As delineated in *Stenger*, these interests include an individual's "right to be let alone," *Stenger*, 530 Pa. at 435, 609 A.2d at 801 (citing, *inter alia*, *Carey v. Brown*, 447 U.S. 455, 471, 100 S. Ct. 2286, 2295 (1980)), as well as his interest in independence in making certain types of important decisions and in avoiding disclosure of personal *information, see id.* at 434, 609 A.2d at 800 (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600, 97 S. Ct. 869, 876-77 (1977)), which could "impugn his character and subject him to ridicule or persecution." *Id.* In the balancing of rights and interests inherent in our civil justice system, however, individuals are compelled every day to submit to depositions, including those taken by video, which are becoming a staple of the modern litigation environment. In such context, judgments concerning the conduct of discovery are left, in the first instance, to the courts of original jurisdiction. *Accord Seattle Times*, 467 U.S. at 36, 104 S. Ct. at 2209 (remarking that, under federal procedural rules, "broad discretion [is conferred] on the trial court[,]" because "[t]he trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery").

The fact that the ruling at issue is of a type which was best invested in the discretion of the common pleas court -- and should not give rise to a prolonged intermediate delay in the proceedings (such as has now occurred) -- is made apparent in considering the various factors militating in favor of each party in terms of the advisability of a protective order. On Appellant's side, the case does center upon a self-admitted misrepresentation by Appellee, and certainly there is a history of litigation involving Appellant and Appellee's media employer. *See Dougherty*, 97 A.3d at 1272 (Mundy, J., concurring and dissenting) (summarizing such history). It is also relevant that "pretrial depositions and interrogatories are not public components of a civil trial." *Seattle Times*, 467 U.S. at 33, 104 S.Ct. at 2207. *See generally United States. v.*

*Caparros,* 800 F.2d 23, 25 (2d Cir. 1986) (explaining that "a litigant does not have 'an unrestrained right to disseminate information that has been obtained through pretrial discovery'" and "has no First Amendment right of access to information made available only for purposes of trying his suit." (quoting *Seattle Times,* 467 U.S. at 31, 32, 104 S. Ct. at 2207)). Here, as is the case elsewhere, Appellant does have a legitimate interest (albeit not one rising to a constitutional dimension) in the discovery process not being abused to his detriment. [12]

On the other hand, there is no allegation of a media "frenzy" or "circus-like atmosphere" in the present circumstances, such as was the case in the *Cosby* matter upon which Appellant substantially relies. *Cosby*, 529 F. Supp. 2d at 422. Additionally, Appellant has cited to no history, on the part of Appellee, her counsel, or her media employer, of disseminating non-record documents developed in litigation. *Compare Paisley Park Enters., Inc. v. Uptown Prods.*, 54 F. Supp. 2d 347, 348 (S.D.N.Y. 1999).

---

[12] Parenthetically, we have great difficulty with the inference, suggested by Appellant, that the refusal of Appellee's counsel to accede to a special demand made at the outset of a deposition suggests an improper motive on the attorney's part. To the contrary, nothing on this record would seem to provide grounds for disbelieving the lawyer's representation -- as an officer of the court -- that she has no intention of using the videotape for any purposes other than the litigation. *See* N.T., Mar. 16, 2012, at 6, 11-12, 16-17, 24-25, 30. *See generally Condit*, 225 F.R.D. at 117 (expressing an unwillingness, on the part of a court of original jurisdiction, to "infer that simply because [a plaintiff's attorney] opposed the instant motion [for a protective order] that he will engage in smear tactics against [the defendant] through the media"). Notably, Appellee's counsel has acknowledged an awareness that pretrial depositions which have not been entered into the record are not public components of a trial, *Seattle Times*, 467 U.S. at 33, 104 S.Ct. at 2207, and embraced her obligations under the Rules of Professional Conduct and Civil Procedure. *See* N.T., Mar. 16, 2012, at 9, 11-12. Moreover, given the prospect that something legitimately newsworthy could occur or be revealed at the deposition, counsel's dilemma in being asked for an on-the-spot commitment to non-dissemination while representing a media agent seems apparent.

The present matter is also not one in which there would appear to be any threatened commercial use. *See id.*[13]

To our minds, these and other factors presented demonstrate, vividly, that the common pleas court's ruling was of an individualized, fact-sensitive nature. *See generally Condit*, 225 F.R.D. at 117-18 (collecting cases with various outcomes concerning protective orders relative to depositions, including some conducted by video recording). This aspect, as well, informs our determination that the matter is not one of such broad public importance as to justify an immediate as-of-right appeal.[14] To the extent that Appellant seeks a *per se* rule -- either creating a right of privacy in one's

---

[13] It also seems relevant that Appellant did not seek an agreement and/or protective relief in advance of the deposition, as obviously should have been done. Indeed, per the applicable rules, even if Appellant had sought judicial relief, the deposition should have gone forward in the absence of a court order restraining it. *See* Pa.R.C.P. No. 4013. The suggestion of Appellant's counsel that they did not believe there would be any issue securing an agreement to their on-the-spot demands, *see, e.g.*, N.T., Mar. 16, 2012, at 31, 36 ("I never thought for a minute that it was requesting something that you wouldn't agree to just in a second."), seems particularly under-informed. In this respect, Appellant portrays the relationships involved as historically acrimonious ones, and both parties' briefs make reference to other litigation over non-dissemination orders. *See, e.g.*, *Cosby*, 529 F. Supp. 2d at 421-22; *Paisley Park Enters.*, 54 F. Supp. 2d at 348-50; *Condit*, 225 F.R.D. at 116-20.

Along these lines, the decision to forego an effort to seek advance agreement or relief in furtherance of the asserted privacy concern seems inconsistent with the notion, presently advanced, that the interest is so important as to implicate an exceptional avenue of judicial review.

[14] This is not to say that we agree with the entirety of the common pleas court's rationale. Indeed, that court's assertion that the possibility of another defamation suit served as a remedy for any abuse of the discovery process ignores, among other factors, the burdens and risks of litigation, exacerbated by the very high standard of proof pertaining in cases involving public figure plaintiffs and media defendants. *See, e.g.*, *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 592 Pa. 66, 83-84, 923 A.2d 389, 400 (2007).

visage relative to videotape depositions or effectuating a blanket protective order precluding public dissemination in relation to all videotape depositions -- we do not reach these questions given our conclusion that jurisdiction is lacking (albeit our position concerning the application of the importance criterion in this case may suggest an inclination against vindicating either of these positions).

In light of the above, we hold that a generalized claim that public disclosure of the videotape of the deposition could infringe upon Appellant's privacy or cause him embarrassment -- based largely upon the mere possibility of dissemination of unknown content -- is insufficient to raise the type of issue which is "too important to be denied review" under the collateral order doctrine. *Rae*, 602 Pa. at 69, 977 A.2d at 1124.

The application for relief challenging temporary judicial assignments made to the Supreme Court for purposes of resolving this appeal is denied.

The order of the Superior Court is vacated, the present appeal is quashed as an unauthorized interlocutory one, and the matter is remanded to the common pleas court.

Chief Justice Saylor, Justice Wecht, Senior Judges Colins, Friedman, and Leadbetter, Judge Brobson, and Senior Judge Strassburger join the *Per Curiam* Opinion with respect to Parts I and II. Chief Justice Saylor, Justice Wecht, Senior Judges Colins, Friedman, and Leadbetter, and Judge Brobson join the *Per Curiam* Opinion with respect to Part III. Chief Justice Saylor, Justice Wecht, and Senior Judges Leadbetter and Strassburger join the *Per Curiam* Opinion with respect to Part IV.

Senior Judge Leadbetter files a concurring statement.

Senior Judge Strassburger files a concurring and dissenting opinion, with the dissenting portion pertaining to Part III of the *Per Curiam* Opinion.

Senior Judge Colins files a concurring and dissenting opinion, joined by Senior Judge Friedman, with the dissenting portion pertaining to Part IV of the *Per Curiam* Opinion.

Senior Judge Friedman files a concurring and dissenting opinion, with the dissenting portion pertaining to Part IV of the *Per Curiam* Opinion.

Judge Brobson files a concurring and dissenting opinion, with the dissenting portion pertaining to Part IV of the *Per Curiam* Opinion.